### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXIS SKLAIR, STERLING RETTKE, NATHANIEL BROWN, BRIAN GILES, JOCELYN REYNOLDS, and CARYN AUSTEN on behalf of themselves and all others similarly situated, | **COMPLAINT – CLASS ACTION** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| -vs.- | **Case No. 20 Civ. 2495 (LTS) (GWG)** |
| MIKE BLOOMBERG 2020, INC., and MICHAEL BLOOMBERG, | |
| Defendants. | |

### INTRODUCTION

Michael Bloomberg and Mike Bloomberg 2020, Inc. made promises when they hired thousands of loyal, hardworking staffers to help Michael Bloomberg win the Democratic presidential primary and help support the Democratic nominee for president, no matter who it was, to win the general election. They promised that the nature of the staffers' work would involve both primary and general election work (either working directly for the campaign or another entity established or funded by Michael Bloomberg), which would be crucial to defeating Donald Trump. And they also promised that Michael Bloomberg had committed the funds necessary to keep the campaign's offices open through November 2020 and employ the staffers on the general election (again, either working directly for the campaign or another entity established or funded by Michael Bloomberg). They offered salaries nearly double that of other campaigns. And they pledged to keep their promises regardless of whether Michael Bloomberg won the Democratic nomination.

Thousands of people relied on these promises. They moved to other cities. They delayed or forewent educational opportunities. They resigned from longstanding jobs with solid pay and benefits. They declined career-building job opportunities. They uprooted their lives for Michael Bloomberg and his campaign.

But the promises turned out to be false. After Bloomberg lost the Democratic nomination, in March 2020 his campaign unceremoniously terminated thousands of staffers, leaving them with no employment, no income, and no health insurance (though in late April 2020 the campaign offered to provide health insurance benefits through November 2020 for staffers who lacked it). And then Michael Bloomberg himself failed to follow through on his promise to employ the staffers on the general election through another entity established or funded by him. And, worse still, Michael Bloomberg and the Bloomberg campaign did this during the worst global pandemic since 1918, in the face of an economic crisis. Thousands of people who relied on these false promises were left to fend for themselves. And since the filing of the complaint, the nation has tumbled into the worst recession since the Great Depression, with the unemployment rate skyrocketing to 14.7% in April 2020.

In this class action lawsuit, the plaintiffs seek to hold Michael Bloomberg and his campaign accountable for the false promises that they made and thereby protect the economic security of over 2,000 working families at a uniquely precarious time in the nation's history.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter at issue exceeds $5 million, exclusive of interest and costs, and is a class action in which at least one member is a citizen of a different state than that of the defendants.

2. This Court has personal jurisdiction over Michael Bloomberg and Mike Bloomberg 2020, Inc. There is general jurisdiction because Michael Bloomberg, the former Mayor of New

York City, is a resident of this district, and because Mike Bloomberg 2020, Inc. is headquartered in this district at 909 Third Avenue, New York, NY 10022. There also is specific jurisdiction over the action, as the claims arise out of or relate to activities or events in this district, such as the false promises that were made by the defendants and/or their agents in this district and the direction that Michael Bloomberg and the campaign's New York-based management gave to regional staffers throughout the nation to repeat the same false promises to staffers, including the plaintiffs.

3.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), as the defendants reside in this district, and is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred in this district.

4.     This action is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

**THE PARTIES**

5.     Plaintiff Alexis Sklair is a resident of Charleston, South Carolina, and worked for Mike Bloomberg 2020, Inc. in Georgia. She began working as a field organizer for the campaign in January 2020 and was terminated in March 2020. During her employment with the campaign, she earned a salary of $6,000 per month and received health insurance and other employee benefits.

6.     Plaintiff Sterling Rettke is a resident of Bellingham, Washington, and worked for Mike Bloomberg 2020, Inc. in Washington State. He began working for the campaign as a field organizer in January 2020, and was terminated in March 2020. During his employment with the campaign, he earned a salary of $6,000 per month and received health insurance and other employee benefits.

7.      Plaintiff Nathaniel Brown is a resident of Salt Lake City, Utah, and worked for Mike Bloomberg 2020, Inc. in Utah. He began working for the campaign as a field organizer in January 2020, and was terminated in March 2020. During his employment with the campaign, he earned a salary of $6,000 per month and received health insurance and other employee benefits.

8.      Plaintiff Brian Giles is a resident of Marshfield, Wisconsin, and worked for Mike Bloomberg 2020, Inc. in Wisconsin. He began working for the campaign as a field organizer in January 2020, and was terminated in March 2020. During his employment with the campaign, he earned a salary of $6,000 per month.

9.      Plaintiff Jocelyn Reynolds is a resident of Middleville, Michigan and worked for Mike Bloomberg 2020, Inc. in Michigan. She began working for the campaign as a field organizer on February 1, 2020 and was terminated on March 30, 2020. During her employment with the campaign, she earned a salary of $6,000 per month.

10.      Plaintiff Caryn Austen is a resident of Cuyahoga Falls, Ohio and worked for Mike Bloomberg 2020, Inc. in Ohio. She was hired as a field organizer on January 31, 2020, and was terminated in March 2020. During her employment with the campaign, she earned a salary of $6,000 per month and received health insurance and other employee benefits.

11.      Defendant Mike Bloomberg 2020, Inc. (Mike Bloomberg 2020, the Bloomberg campaign, or the campaign) is the presidential campaign of Michael Bloomberg. Its headquarters are located at 909 Third Avenue, New York, NY 10022.

12.      Defendant Michael Bloomberg is a resident of New York City, was the Mayor of New York City from 2002 to 2013, and was briefly a candidate for president of the United States from late 2019 through March 2020.

## FACTUAL ALLEGATIONS

13.    In January 2020, Alexis Sklair relocated from Charleston, South Carolina to Savannah, Georgia to work as a field organizer for Mike Bloomberg 2020. Before joining the Bloomberg campaign, she had worked as an organizer for Senator Cory Booker's presidential campaign, as well as other Democratic political campaigns. When Senator Booker dropped out of the presidential election in January 2020, Ms. Sklair was offered multiple jobs, including by former Governor Deval Patrick's presidential campaign. At the time that Ms. Sklair accepted the position with Mike Bloomberg 2020, she had just been offered a deputy campaign manager position on a state senate campaign in South Carolina for a candidate who later won the primary. Because she accepted the job with Mike Bloomberg 2020, she declined the offer to work for the state senate campaign. She also declined an offer to work for the Patrick campaign.

14.    Sterling Rettke is a 2018 graduate of Western Washington University. Rettke took the LSAT, then applied to law school beginning in fall 2020. In January 2020, Rettke agreed to work as a field organizer for Mike Bloomberg 2020 and, relying upon that job and the promises made by the defendants, he withdrew his law school application and decided to postpone applying to law school. Rettke will now apply for law school in 2021, having lost a year to begin his law school education.

15.    Nathaniel Brown moved from Las Vegas, Nevada to Salt Lake City, Utah to work as a field organizer for Mike Bloomberg 2020 in January 2020. Before joining the Bloomberg campaign, he had worked as an organizer for Senator Kamala Harris's presidential campaign. When Senator Harris dropped out of the presidential election in December 2020, he considered whether he would join another presidential campaign or pursue other work opportunities. When he accepted the position with Mike Bloomberg 2020, he dropped out of the advanced stages of the hiring process for a job as an organizer with the Democratic Congressional Campaign Committee

(DCCC), a role in which Brown would have worked on the Democratic Party's general election campaign through November 2020.

16.     Brian Giles had worked in sales at Mid-State Truck Service, Inc. for nine years when he was offered a position with the Bloomberg campaign in early 2020. Before joining the Bloomberg campaign, he was earning approximately $50,000 per year in that stable position before he was induced to join the Bloomberg campaign.

17.     Jocelyn Reynolds has extensive experience in sales and construction and had just been offered the role of Regional Sales Director at FBI Buildings before joining the Bloomberg campaign. In that role, she would have made $60,000 per year plus commissions on any sales and a guaranteed six-month initial contract. She was told that after those six months she could be promoted to management if she were able to recruit additional sales staff to work for her. Because she accepted the job with Mike Bloomberg 2020, she declined this job offer.

18.     Caryn Austen has extensive experience in data analysis, customer service, and quality assurance. Before joining the Bloomberg campaign in January 2020, she had worked for nearly 5 years for Nestle as a reference data analyst in which she performed business analyst work, managed databases, and managed web sites. She earned approximately $50,000 per year, had been promoted, and had an upward career trajectory at Nestle.

19.     Unless otherwise expressly stated below, every promise and statement that a campaign official or staffer made to the plaintiffs and other field staffers was made as an agent of the campaign *and* Michael Bloomberg, and every such campaign official or staffer had express, implied, or apparent authority to make such statements on behalf of the campaign *and* Michael Bloomberg. Any reference in this complaint to Michael Bloomberg or Mike Bloomberg 2020, Inc. making a statement or promise shall include any statement or promise made by any campaign official or staffer of Mike Bloomberg 2020, Inc. Likewise, any reference to a statement or promise

made by any campaign official or staffer of Mike Bloomberg 2020, Inc. shall be considered a statement or promise made by Michael Bloomberg and Mike Bloomberg 2020, Inc.

20.     In addition, all of the promises and statements that campaign officials (including Michael Bloomberg) or staffers made to the plaintiffs and other field staffers regarding work on the general election and/or through November 2020 were intended by the campaign officials and were understood by the field staffers to pertain to work either directly for Mike Bloomberg 2020, Inc. or another entity established or funded by Michael Bloomberg himself.  In other words, it was understood by Michael Bloomberg, the campaign officials, and the field staffers that if Mike Bloomberg 2020 did not employ the field staffers on or through the general election, that another entity established or funded by Michael Bloomberg would do so in order to fulfill the promises that Michael Bloomberg and the campaign had repeatedly made to induce the plaintiffs and the other field staffers to join his campaign and continue working for it.

21.     Like other field staffers who joined the Bloomberg campaign, Sklair, Rettke, Brown, Giles, Reynolds, and Austen were all attracted to working for Michael Bloomberg and the Bloomberg campaign largely because Michael Bloomberg and the Bloomberg campaign promised them and all the other Bloomberg field staffers (*i.e.*, field organizers, deputy field organizers, and regional organizing directors) that the nature of the staffers' work would involve both primary and general election work, either working directly for the campaign or another entity established or funded by Bloomberg, regardless of whether Bloomberg won the nomination, and that Michael Bloomberg and the Bloomberg campaign had committed the funds necessary to keep field offices open through November 2020 and employ the staffers on the general election, either working directly for the campaign or another entity established or funded by Bloomberg.

22.     Specifically, as to Rettke, in early December 2019, a female campaign aide in the campaign's New York-based headquarters told him in substance during a phone interview that

"this is rare for field organizers" to perform both primary and general election work. The female aide said in substance: "you will work in your primary until Washington State, and in other states for other primaries, after the primary, and once the nominee is decided, you will work for whoever the nominee is" in the general election. This message was repeated by multiple campaign representatives after Rettke began working for the campaign.

23.     Between January 17 and 19, 2020, Harrison Louie, a Campaign Regional Organizing Director in Washington State, told Rettke during a phone interview in substance that he would be "guaranteed" to work on the general election.

24.     On January 20, Rettke signed a contract with the campaign. On or about January 20-21, Kamille Dye, the Campaign Operations Director for Washington State, stated in substance in the first onboarding (training) meeting for Rettke and about eight other organizers: "this is an awesome opportunity," and described how they would do both primary and general election work. On January 23, 2020, the Washington State Campaign Director, Grant Lahmann, told Rettke that "it's a rare opportunity to be promised the job" that would involve both primary and general election work. While working for the Campaign in Washington State, numerous Campaign representatives said in substance that: "Regardless of whether he's the candidate, Bloomberg will continue to bankroll you" to work on the general election.

25.     As to Brown, in January 2020, Rudy Miera, a Utah field director for the Campaign, told Brown during an interview: "Regardless of what happens, organizers [including Brown] will have a job" on and through the general election. Miera repeated this promise many times after the campaign hired Brown. In an in-person meeting before Super Tuesday, Lauren Littlefield, the Utah State Campaign Director, also told Brown and about seven other organizers that *senior staff* would not have a job after Bloomberg ends his primary campaign, but *field organizers* such as Brown would continue to work on the general election. It was a mantra of campaign representatives in

Utah that field organizers such as Brown would continue to work on the general election, regardless of whether Bloomberg became the Democracy presidential nominee.

26.     As to Sklair, in the first two weeks of January, at her initial screening by the campaign's New York-based headquarters by phone, a campaign representative asked Sklair to commit to work on and through the general election and told her that the work would be on and through the general election. In a phone interview with Madison Gardner, a regional organizing director for the campaign in Georgia, around January 15, 2020, Gardner asked if Sklair would commit to work through the general election, and said Sklair was guaranteed to work on and through the general election.

27.     Sklair gave the campaign her commitment to work on and through the general election. In late January 2020, Sklair moved to Georgia to work for the Campaign. There, multiple Campaign trainers, including regional organizing directors, the field director, and other campaign staffers repeatedly promised that Sklair would work on and through the general election.

28.     Many of the campaign scripts that staffers like Sklair used to speak with voters in Georgia informed voters that Michael Bloomberg would support the eventual Democratic nominee and that the Bloomberg's field organizers would continue to work for the eventual Democratic nominee.  Upon information and belief, staffers in Georgia, Colorado, and other states were provided with scripts containing the same messages to communicate to voters, and those scripts were approved by the campaign's headquarters in New York.

29.     As to Giles, in mid-January 2020, he was told by Wisconsin Regional Hiring Manager Maura Tracy that he was being hired to perform work not only on the Democratic primary, but also on the general election campaign to support the Democratic nominee for President "no matter what happens" in the primary. He received this same message—that he was being hired to work on both the primary campaign of Michael Bloomberg and the general election

campaign of whomever won the Democratic nomination for president, whether it was Bloomberg or another candidate—both  through public statements from Michael Bloomberg himself and from other campaign aides at campaign headquarters in New York, with whom he spoke with over the phone as part of the interview and recruitment process. These campaign aides further assured Giles he was being hired to do primary and general election work, whether the nominee turned out to be Michael Bloomberg or another candidate.

30.    The promises that Giles would be hired to do both primary and general election work and that Michael Bloomberg and his campaign had committed resources to operating through the general election, regardless of the outcome of the primary, are what made the position seem worth it to leave a job of nine years.

31.    As to Reynolds, she was told throughout her recruiting process in late January 2020 by Roland Leggett, the Regional Director in Michigan, that the position was to do both primary and general election work. Leggett, who Reynolds had met through a mutual friend, emphasized to Reynolds through the last two weeks of January 2020 as she made her employment decision that this promise—that field organizers were being hired to not just do primary work but also general election work—came from the Bloomberg campaign's headquarters in New York and was being disseminated regionally at the campaign's express direction. This was at the behest, of course, of the candidate, Michael Bloomberg.

32.    In accordance with those directions by the campaign's headquarters, it was frequently repeated by Michigan hiring managers that Michael Bloomberg was so dedicated to getting President Trump out of office that he had committed campaign resources to help elect the winner of the Democratic primary, no matter who the candidate was.

33.     Just days before Austen was offered her job with the campaign on January 31, 2020, Austen was told by Alex Niswonger, a regional organizing director in Ohio, that her duties on the campaign would involve both primary and general election work, and that Michael Bloomberg and the campaign had committed to fully funding offices and staff through the end of the general election cycle. Before she spoke with Niswonger, another field organizer, Brad Prescutto, who was later promoted to regional organizing director, told her that the campaign had made the same promises to him, and that it was "unlike anything you've experienced." Before she accepted her position with the campaign, Austen also read news stories that made statements similar to the promises that were made to her, including a news story provided to her by campaign staffer Robert Castenada. Both Niswonger and Prescutto made clear to Austen that her work on the general election would be either for the Bloomberg 2020 campaign or another entity established or funded by Bloomberg, because campaign finance laws might not allow the campaign to directly employ them to support a general election candidate besides Michael Bloomberg.  These promises induced Austen to quit the stable and rewarding job that she had at Nestle for nearly five years and to transition to what she hoped would be a new a career in politics.

34.     Sklair, Rettke, Brown, Giles, Reynolds, Austen, and other field staffers hired by Mike Bloomberg 2020 were steadfast in their goal of defeating Donald Trump, out of their grave concern that Donald Trump is a threat to the nation's democracy and security. They wholeheartedly agreed with the words that Michael Bloomberg uttered when he announced his campaign on November 24, 2019:

> We cannot afford four more years of President Trump's reckless and unethical actions. He represents an existential threat to our country and our values. If he wins another term in office, we may never recover from the damage. The stakes could not be higher. We must win this election. And we must begin rebuilding America.

Mike Bloomberg 2020, *Mike Bloomberg Announces 2020 Democratic Presidential Campaign* (Nov. 24, 2019), https://mikebloom.bg/3bdZqaS.

35.     Michael Bloomberg and his campaign's hiring managers understood that potential applicants for field staff positions like the plaintiffs would be motivated to work on the Bloomberg campaign because of their interest in working on the general election to defeat Donald Trump, whether that work was directly for the Bloomberg campaign or another entity established or funded by Bloomberg. Accordingly, Michael Bloomberg and his campaign's hiring managers expressly promised field staff applicants for Mike Bloomberg 2020 that they would be employed to perform work on the primary campaign to elect Michael Bloomberg as the Democratic nominee for president *and* on the general election (either directly for the campaign or for an entity established or funded by Michael Bloomberg), regardless of whether Bloomberg won the nomination, and they stated that Michael Bloomberg and the campaign had committed the funds necessary to keep offices open through November 2020 and employ the staffers on the general election (again, either directly by the campaign or for an entity established or funded by Michael Bloomberg).

36.     The Mike Bloomberg 2020 hiring managers at the campaign's headquarters, acting as agents of both the campaign and its principal Michael Bloomberg, ordinarily made such statements to field staff applicants, including and specifically to the plaintiffs, when conducting initial interviews of staffers before such staffers interviewed with regional field directors.

37.     In addition, at the express direction of the campaign's New York-based headquarters and campaign managers, and guided by interview worksheets provided by headquarters, regional hiring managers repeated the same statements to field staff applicants, including to the plaintiffs, and consistent with their directions from headquarters they emphasized in interviews and recruiting efforts that the applicants would be working on and through the general election, even though the applicants' specific locations would not be guaranteed.

38.     The defendants' interview template instructed interviewers to inform applicants: "Employment through November 2020 with Team Bloomberg (not guaranteed location you are at now)." In other words: though the employees' "location" was not guaranteed, the staffers were guaranteed to perform work on both the primary and general election. This guarantee was made at the behest of the campaign and the candidate, Michael Bloomberg.

39.     Michael Bloomberg and his campaign made similar public statements on a number of occasions about how he and his campaign had committed the funds to continue to keep open field offices and employ the campaign's field staffers to perform general election work even if Bloomberg failed to secure the Democratic nomination.

40.     Michael Bloomberg and the campaign's promises that they had committed the funds to keep open and finance field offices and employ field staffers through the general election were consistent with public reports, which the plaintiffs and other field staff applicants believed to be true representations. *See, e.g.*, Josh Lederman and Stephanie Ruhle, *Bloomberg to fund sizable campaign effort through November even if he loses Democratic nomination; Exclusive: The former New York City mayor plans to continue paying hundreds of staffers and funding his digital operation to defeat Trump even if he's not the nominee*, NBC News (Jan. 10, 2020), https://nbcnews.to/3dqaAuY (stating that the Bloomberg campaign told NBC News that his "army" of staffers "will march on through the general election in November even if he loses the Democratic nomination" and that "he has committed to paying" those staffers to work in battleground states).

41.     Even days before Michael Bloomberg dropped out of the presidential race, consistent with his and the campaign's prior promises, Michael Bloomberg personally "specified that he planned to keep his 'main field offices' open, regardless of the results on Super Tuesday." Rebecca Ruiz, *Bloomberg's Job Security Promises Are Falling Through, Campaign Workers Say*, N.Y. Times (Mar. 10, 2020), https://nyti.ms/2Wy673D.

42.     Bloomberg and his campaign made these promises about how field staff applicants would do both primary and general election work and how Bloomberg and the campaign had committed the funds necessary to keep offices open through November 2020 and employ the staffers on the general election (either directly for the campaign or another entity established or funded by Bloomberg), because the campaign was launched just months before voters would begin casting ballots in the Democratic primary, and offering this unique opportunity to perform both primary and general election work was necessary to entice many staffers to join Mike Bloomberg 2020. They knew that such promises would cause field staff applicants to join the Bloomberg campaign rather than pursue jobs with other campaigns or remain in or pursue work with employers outside the political realm. It is unprecedented for a primary candidate for president to promise staffers that they would be employed to perform both primary and general election work and that the candidate had committed the funds to keep field offices open during the general election, regardless of the outcome of the candidate's primary election.

43.     But all of these promises were false.

44.     Notwithstanding the fact that Michael Bloomberg and the campaign made these promises, when Mike Bloomberg 2020, Inc. entered into an employment agreement with the staffers it required all of its field staffers to sign take-it-or-leave-it form contracts that identified the staffers as "at-will" employees of Mike Bloomberg 2020, Inc. and stated that that Mike Bloomberg 2020, Inc. "may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason."

45.     Michael Bloomberg was not a party to the employment contracts between the staffers and Mike Bloomberg 2020, Inc. He did not sign them and the only party entering the contracts with the staffers was Mike Bloomberg 2020, Inc. The plaintiffs and other staffers never signed a written contract with Michael Bloomberg, even though Michael Bloomberg's promises

had induced them to join his campaign and continue working for it until the time they were terminated in March 2020, and Michael Bloomberg had committed to hiring them to do general election work, whether through his campaign or through another vehicle, such as a political action committee.

46.     Mike Bloomberg 2020 officials also made false or misleading statements to members of the putative class about the law—*e.g.*, that a contract must specify that employment is at-will in a state that recognizes at-will employment—in order to convince the field staffers to sign the form contracts that the campaign presented to them on a take-it-or-leave-it basis. For example, Rettke was falsely told by a campaign staffer that a contract in Washington state must include an at-will employment provision because Washington is an at-will state, which convinced him to sign the contract under false pretenses.

47.     Throughout the time that the plaintiffs worked for the campaign, including until days before Michael Bloomberg dropped out of the race, Michael Bloomberg and the campaign continued to make the same false promises to induce other staffers to join the campaign and to induce the plaintiffs and other field staffers to continue working for the campaign.

48.     On March 4, 2020, Michael Bloomberg announced that he would no longer seek the Democratic nomination and endorsed former Vice-President Joe Biden's presidential campaign.

49.     But even after Michael Bloomberg dropped out of the presidential race on March 4, 2020, the campaign continued to repeat and spread its false promises for weeks, causing most of the plaintiffs and other staffers to refrain from actively seeking employment during that time.

50.     Seeing Bloomberg's poor performance on Super Tuesday, Giles decided to apply for a job with the Wisconsin Democratic Party in early March 2020 out of an abundance of caution. Mr. Giles was offered a position for $4,000 a month to work for the Wisconsin Democratic Party through the general election in November 2020.

51.     But the Bloomberg campaign continued to perpetuate its fraud and caused Giles to forego this new opportunity. Wisconsin Hiring Manager Maura Tracy and State Director Jonathan Levine told Wisconsin campaign staff, including Giles, that they "shouldn't worry" and that campaign offices within the state would stay open, consistent with Michael Bloomberg and the campaign's earlier promises. Giles was assured that not only would he still have a job, but that he would not have to relocate.

52.     Tracy and Levine also told Wisconsin campaign staff, including Giles, that Michael Bloomberg and the campaign had still committed the resources to employing them to support the Democratic nominee through the general election, and that the Bloomberg campaign was just working out the logistics of whether the campaign would be transformed into an independent expenditure organization or as a political action committee to support the presumptive Democratic nominee Joe Biden. This, again, was consistent with all of the prior promises by Michael Bloomberg and his campaign.

53.     Based on this repeated promise that he would work on the general election and that Mike Bloomberg 2020 was actively working to create an appropriate structure to allow campaign staff to work on the general election for an entity established or funded by Michael Bloomberg, Giles turned down the job offer from the Wisconsin Democratic Party.

54.     Reynolds also received additional false promises after Super Tuesday, when it became apparent that Michael Bloomberg would not become the Democratic nominee for President.

55.     Reynolds was told by Regional Director Roland Leggett that the campaign was being "restructured" in light of Michael Bloomberg's defeat. He told Reynolds that the Bloomberg campaign headquarters in New York was steadfast that staff would continue to work on and through the general election and that any delay was just a matter of figuring out the appropriate structure in light of campaign finance requirements.

56.     Reynolds also received a form via email from the Bloomberg campaign headquarters asking if she would be willing to move locations. The premise of this question was that, consistent with the prior promises of Michael Bloomberg and the campaign, the staffers would continue to work for Michael Bloomberg, but some staff would have to move locations to work on the general election. Reynolds indicated that she was willing to move, if needed, to work on the general election.

57.     Reynolds was even assured by Leggett and other supervisors in the Grand Rapids, Michigan campaign office that they were being told by campaign headquarters that it was unlikely they would have to move offices because Michigan is a "swing state."

58.     Indeed, Bloomberg's own media company reported on March 4, 2020 that "Michael Bloomberg endorsed Joe Biden for the Democratic nomination as he ended his presidential campaign on Wednesday and pledged to continue working to defeat President Donald Trump." Mark Niquette, *Michael Bloomberg Ends Presidential Bid, Endorses Joe Biden*, Bloomberg News (Mar. 4, 2020), https://www.bloomberg.com/news/articles/2020-03-04/bloomberg-suspends-presidential-race-after-super-tuesday-losses. As Michael Bloomberg stated, "'It's clear that candidate is my friend and a great American, Joe Biden,'" and "he asked his supporters to help Biden win the general election." *Id.* Moreover, he continued to falsely "vow[] to keep spending money and put the formidable infrastructure he built for his campaign in key battleground states at the service of the nominee." *Id.*

17

59.     Weeks later, on March 20, 2020, Mike Bloomberg 2020 informed the plaintiffs and the other field staffers that they had been terminated, that they would receive their last paychecks in the last week of March 2020 or the first week of April 2020, that they would lose their health insurance and other benefits at the end of March 2020, and that they would not be employed by Mike Bloomberg 2020 to perform work on the general election. They also were told that neither Michael Bloomberg nor the campaign would guarantee their employment to work on the general election for any other organization. Though Michael Bloomberg had announced that he would transfer $18 million from his campaign to the Democratic National Committee (DNC)—far less than the funds needed to employ the campaign's staffers on or through the general election—he had not made any arrangement with the DNC under which the staffers would be guaranteed employment on the general election.

60.     Instead of making good on the promise that the field staffers would perform work on the general election campaign, either directly for the campaign or another entity established or funded by Michael Bloomberg, representatives of Michael Bloomberg and Mike Bloomberg 2020 told the plaintiffs and the other field staffers that, like anyone else, they could apply for field staff positions with the DNC to work on the general election. However, the former Bloomberg campaign staffers' applications would be considered in the same fashion as all other applicants, on a competitive basis without any preference. A large portion of former Bloomberg campaign staffers were not hired by the DNC even when they were qualified for those positions and applied; and it is near certain that any former Bloomberg campaign staffer who did get a job is earning substantially less than she or he was with Mike Bloomberg 2020. *See* Rebecca R. Ruiz, *The Bloomberg Campaign Is a Waterfall of Cash*, N.Y. Times (Feb. 13. 2020), https://www.nytimes.com/2020/02/13/us/politics/bloomberg-campaign-cash.html (stating that "[t]he [Bloomberg] campaign's pay for

field organizers, the equivalent of $72,000 annually, is well above the $42,000 that other campaigns have offered.").

61.     The termination of the Mike Bloomberg 2020 field staffers was widely reported as the campaign breaking clear and fundamental promises that Michael Bloomberg and his campaign had made to their field staffers. *See* Rebecca Ruiz, *Bloomberg's Job Security Promises Are Falling Through, Campaign Workers Say*, N.Y. Times (Mar. 10, 2020), https://nyti.ms/2Wy673D; Hayley Miller, *Bloomberg Aides Say Campaign Not Following Through on Employment Promises: Reports*, Huffington Post (Mar. 10, 2020), https://bit.ly/2xi6HrG.

62.     From one day to the next, Michael Bloomberg and his campaign left thousands of loyal staffers without a paycheck and without health insurance, in the middle of the worst global pandemic since 1918.

63.     Nothing material occurred between the time that Michael Bloomberg and his campaign made the promises described in this complaint to alter the ability of Michael Bloomberg or the campaign to fulfill the promises that were made to the plaintiffs and the putative class members.

64.     For instance, on March 4, 2020, the day that he ended his presidential campaign, Michael Bloomberg had a net worth of $58.4 billion and was one of the world's richest billionaires. *See* Chloe Foussianes, *Michael Bloomberg's Net Worth Ranks Him Among the World's Top Billionaires*, Town & Country (Mar. 4, 2020), https://www.townandcountrymag.com/ society/money-and-power/a25781489/michael-bloomberg-net-worth/. This is $5 billion more than his net worth when he began his campaign in the fall of 2019—and even then, when he only had $53 billion, he was "17 Times Richer Than Donald Trump," Michela Tindera & Dan Alexander, *Here's Why Michael Bloomberg Is 17 Times Richer Than Donald Trump*, Forbes (Nov. 22, 2019), https://www.forbes.com/sites/michelatindera/2019/11/22/heres-why-michael-bloomberg-is-

17-times-richer-than-donald-trump/#734c599274f7. And during the brief pendency of this lawsuit, Michael Bloomberg's net worth has risen once again to $60.1 billion. Forbes, *#16 Michael Bloomberg, CEO Bloomberg, L.P, Real Time Net Worth*, Forbes, https://www.forbes.com/profile/michael-bloomberg/#5b4831341417 (stating that Michael Bloomberg's real time net worth as of July 1, 2020 is $60.1 billion).

65.     Starting in April 2020, Sklair, Rettke, Brown, Giles, Reynolds, and Austen each lacked any income, and, until the campaign agreed to pay for their COBRA benefits in late April 2020, many of them were uncertain as to whether they would have any health insurance. This was particularly distressing given the global health and economic crises.

66.     Each of the plaintiffs would have retained or pursued other work opportunities had they not accepted field staff positions with Mike Bloomberg 2020.

67.     For example, when Sklair accepted the position with Mike Bloomberg 2020, she turned down both a position on a state senate campaign in South Carolina that would have likely lasted throughout the general election campaign and an offer from another presidential campaign. The state senate campaign position, which would have provided her with greater responsibility and career advancement than the Bloomberg campaign did, would have lasted through November 2020, because the state senate candidate won the primary and is now a candidate in the general election.

68.     When Brown accepted his position with Mike Bloomberg 2020, he dropped out of the advanced stages of the hiring process for a job as an organizer with the Democratic Congressional Campaign Committee (DCCC) in which Mr. Brown would have worked on the general election campaign.

69.     Because Rettke postponed his law school applications to work on the Bloomberg campaign, he will not be able to attend law school until the fall of 2021, even though he now would be available to start law school in the fall of 2020.

70.     Giles left his longtime sales job earning a stable salary to join Mike Bloomberg 2020 *and* he turned down a position with the Wisconsin Democratic Party in March 2020 because of the repeated false promises that he received. Giles would still have his sales job, had he not quit to join Mike Bloomberg 2020, and he would still have his job with the Wisconsin Democratic Party had Michael Bloomberg and the campaign not continued to make false promises to him even after Michael Bloomberg dropped out of the presidential race.

71.     Reynolds turned down a regional sales director job with six months of guaranteed employment and the potential for upward mobility when she accepted her position with Mike Bloomberg 2020. She would still be employed in this position had she not been induced to join the Bloomberg campaign based on the defendants' false promises.

72.     Austen quit a stable job with excellent benefits and an upward career trajectory in order to join the Bloomberg campaign. She would still be employed in this position with Nestle had she not been induced to join the Bloomberg campaign.

73.     After she was terminated by the Bloomberg campaign, Sklair applied to many dozens of jobs for various political campaigns and administrative positions, and she was rejected by them all. In April 2020, Organizing Together offered Sklair a position in Florida, which she was unable to accept due to its location, and on May 11, 2020, Organizing Together offered her a position in Pennsylvania, which she was able to accept. There, she has earned significantly less money than with the Bloomberg campaign. That position ended on June 30, 2020. On July 6, 2020, Sklair begins a job as a field director for a New York State Senate campaign, where she will earn significantly less money than with the Bloomberg campaign.

74.     After he was terminated by the campaign, Rettke applied to many dozens of jobs for various political campaigns, and was rejected by them all. On June 1, 2020, Rettke was hired by the Nevada State Democratic party as a field organizer, where he is earning significantly less money than with the Bloomberg campaign.

75.     After he was terminated by the campaign, Brown applied to many dozens of jobs for various political campaigns and political parties, and was rejected by them. On June 1, 2020, two months after he was terminated by the campaign, Brown began working as a customer representative for a car loan company, where he is earning significantly less money than with the Bloomberg campaign.

76.     Giles has applied to many community organizing positions, but has been unable to find a position in this historically challenging job market. He is currently working as a shopper for the grocery shopping website Instacart, and he is making significantly less money than he did with Mike Bloomberg 2020 or in his prior sales job. He is now making significantly less money than he would have made with the Wisconsin Democratic Party.

77.     Reynolds applied to many other positions but could not find employment for three months following her termination from Mike Bloomberg 2020. Reynolds' husband was forced to empty his 401(k) savings account so that the family could cover their basic household expenses during this period of unemployment. In the last week of June 2020, Reynolds started working in a show room designing kitchens. She is making $20 per hour plus commissions, but commissions are rare with few people looking to remodel their homes during the ongoing COVID-19 pandemic. She is making far less money than she made was while working for the Bloomberg campaign and far less money that she would have made in the regional sales director position that she turned down to join the Bloomberg campaign.

78.     Austen applied for numerous jobs following her termination with the Bloomberg campaign. She attempted to return to her job at Nestle, but because of the global pandemic Nestle was not in a position to rehire her and she was unable to return to her once-stable position at Nestle. She has remained unemployed for the past several months and starts a new position on July 6, 2020 as a service coordinator where she will earn substantially less than she did with the Bloomberg campaign. Because she has a lung condition, upon her termination by the campaign Austen was distraught that she would lack health insurance at the height of a global pandemic in which COVID-19 is disproportionately harming and killing people with preexisting respiratory conditions.

79.     The defendants knowingly made false promises—that field staffers would be guaranteed to perform both primary and general election work for the campaign (either for the campaign directly or another entity established or funded by Michael Bloomberg), and that the field offices would be kept open during the general election to employ the staffers—to induce the plaintiffs and the putative class members to accept employment with the Bloomberg campaign.

80.     The statements by Michael Bloomberg and Mike Bloomberg 2020 that the field staffers would perform both primary and general election work, whether for the campaign or for another entity established or funded by Bloomberg personally, were material facts that directly influenced the plaintiffs' and the other field staffers' decisions to enter into an employment relationship with Mike Bloomberg 2020, perform work for the campaign, and support Michael Bloomberg's candidacy for months, instead of pursuing other work or educational opportunities.

81.     The plaintiffs and the other putative class members did not know that the defendants' representations were false and would not have accepted their positions with Mike Bloomberg 2020, performed work for the campaign, or worked to support  Michael Bloomberg's candidacy in the absence of the defendants' false representations.

82.     The plaintiffs and the other putative class members reasonably relied on the defendants' false representations.

83.     The plaintiffs and the other putative class members were injured by the defendants' false statements. They all left or forewent other work opportunities or educational plans, and they undertook considerable time and effort to relocate or rearrange their lives to work on the Bloomberg campaign and to support Michael Bloomberg's candidacy. They will not be employed by Mike Bloomberg 2020 or another entity established or funded by Michael Bloomberg on the general election to defeat Donald Trump, and it is unlikely that they will be hired to work on another presidential campaign in the general election. And many have been left without any employment, income, or health insurance in the middle of a global pandemic and as the nation heads into a deep recession with skyrocketing unemployment.

84.     Many of the members of the putative class, like Giles, Reynolds, and Austen, would have accepted or remained in longer-term employment and would still be employed in those positions had they not been induced to accept positions with Mike Bloomberg 2020 and support Michael Bloomberg's candidacy. Some putative class members, like Rettke, would have applied for graduate school for the 2020-2021 school year, had they not been fraudulently induced to accept such employment. Delaying their education will reduce their future income and earnings.

85.     The factual allegations that follow this paragraph through Paragraph 93 specifically relate to the plaintiffs' claims against Michael Bloomberg, in addition to the foregoing allegations. To the extent that any are inconsistent with the foregoing factual allegations, they are plead in the alternative to such foregoing factual allegations.

86.     In the case of each of the promises described above, the individuals making the promises on behalf of Michael Bloomberg and the campaign also made a promise that the field staffers' work on the general election would be guaranteed through November 2020, the month

that the 2020 general election for president is scheduled to occur, and that Michael Bloomberg had committed the funding to keep campaign offices open through November and employ the field staffers through November.

87.     In making these promises on behalf of Michael Bloomberg, the individuals making the promises either specified or suggested that the general election work guaranteed through November 2020 would be performed for an entity besides the campaign that would be established or funded by Michael Bloomberg. The same types of promises were made with respect to having committed the funding to keep the offices open and employing the field staffers through November 2020—*i.e.*, that the funding commitment and operation of the offices would apply to another entity established or funded by Michael Bloomberg or his campaign.

88.     The plaintiffs and other putative class members who received these promises understood that the guarantee to work on the general election campaign through November 2020 included the opportunity to work for another entity established or funded by Michael Bloomberg if the Bloomberg campaign did not employ them beyond the primary election.

89.     All of the plaintiffs and putative class members relied on Michael Bloomberg's promises of guaranteed employment through November 2020

90.     All of the promises described above were made either by or on behalf of Michael Bloomberg and for the benefit of Michael Bloomberg, his candidacy, and the advancement of his professional and political reputation, including to induce the staffers to join the Bloomberg campaign, support his candidacy, and commit to working for the campaign or another entity established or funded by Michael Bloomberg on the general election. All of those promises resulted in the staffers joining the Bloomberg campaign, supporting his candidacy, and committing to working for the campaign or another entity established or funded by Michael Bloomberg on the general election.

91.     The campaign officials who made such promises and statements above made them as agents of Michael Bloomberg and the Bloomberg campaign, with express, implied, or apparent authority to make such promises or statements. Upon information and belief, all of the promises and statements that the campaign officials made or directed their employees to make were expressly authorized by Michael Bloomberg.

92.     Upon information and belief, Michael Bloomberg knew that all of these promises were false at the time that he and/or his campaign managers and officials made them on his behalf and as his agent.

93.     Although Michael Bloomberg made promises to all of the plaintiffs and putative class members that he would guarantee their employment through the general election via another entity established or funded by him besides the campaign, Michael Bloomberg did not personally sign a contract with the plaintiffs and the putative class members, and the plaintiffs and putative class members did not agree to be at-will employees of Michael Bloomberg or an alternative entity established or funded by Michael Bloomberg. Any contract was only between the plaintiffs and putative class members on the one hand and Mike Bloomberg 2020, Inc. on the other hand. Notwithstanding the fact that Michael Bloomberg personally benefited from the plaintiffs and putative class members signing the contracts with and working for his campaign, Michael Bloomberg personally has no rights under the contracts between the staffers and Mike Bloomberg 2020, Inc.

## CLASS ACTION ALLEGATIONS

94.     The plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class: All persons who were employed by Mike Bloomberg 2020 as field staff (i.e., field organizers, deputy field organizers, or regional organizing directors/regional field directors) since November 2019 and who were terminated by Michael Bloomberg and/or Mike Bloomberg 2020 prior to the date of the amended complaint.

95.     A class action may be maintained under Rule 23(a) and Rule 23(b)(3), or in the alternative under Rule 23(b)(2) and/or Rule 23(c)(4).

**Numerosity**

96.     The members of the class are so numerous that joinder of all members is impracticable. There are more than 2,000 members of the class, and the members of the class are geographically dispersed across the country.

**Commonality**

97.     There are common questions of both law and fact in this action.

98.     The central questions in this case that will generate a common answer as to the class are (1) whether Michael Bloomberg and/or the Bloomberg campaign made false statements and promises about how the field staffers would have the opportunity to perform work on both the primary and general election (either directly for the campaign or for another entity established or funded by Michael Bloomberg) and that Michael Bloomberg and the campaign had committed the funding to keep open field offices during the general election and employ the field staffers through the general election, (2) whether those statements or promises were made for the purpose of inducing the field staffers to rely upon them, and (3) whether the field staffers reasonably relied on those statements to their detriment.

99.     Another central question as to the plaintiffs and putative class members' claims against Michael Bloomberg is whether they were promised a guarantee of employment on the general election, whether directly with the campaign or through another entity established or funded by Bloomberg personally, through November 2020.

100.     The plaintiffs' claims raise additional common questions, such as the appropriate remedies for the defendants' fraudulent inducement and promissory estoppel violations.

101.     Because Michael Bloomberg and the Bloomberg campaign made the same false statements to field staff applicants throughout the nation from their New York-based headquarters and through their regional hiring personnel, the answers to these questions will produce common answers for all members of the class.

**Typicality**

102.     The plaintiffs' claims are typical of the other members of the class because the claims challenge a uniform policy or practice by which Michael Bloomberg and the Bloomberg campaign made false statements to field staff applicants for the purpose of inducing those applicants to agree to work for Mike Bloomberg 2020 and support Bloomberg's candidacy, because the plaintiffs bring the same legal claims as the other members of the class, and because the plaintiffs suffered the same injuries as other members of the class, including declining or leaving other work or educational opportunities and experiencing a loss of income, health insurance, and other employee benefits.

**Adequacy of Representation**

103.     The plaintiffs will fairly and adequately protect the interests of other members of the class.

104.     The plaintiffs do not have any conflict with any other member of the class.

105.   The defendants do not have any unique defenses against the plaintiffs that would interfere with the plaintiffs' representation of the class.

106.   The plaintiffs are represented by counsel with significant experience in prosecuting class action litigation and representing workers in class actions.

**Rule 23(b)(3)**

107.   The claims can be certified as a class action under Rule 23(b)(3) because the questions of law and fact common to the members of the class predominate over questions affecting only individual members and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

108.   The common questions of law and fact concern whether Michael Bloomberg and the Bloomberg campaign knowingly made false statements about how the field staffers would have the opportunity to perform work on both the primary and general election, and about the commitment of funding to keep the field offices open and employ the field staffers during the general election, whether those statements were made for the purpose of inducing the field staffers to rely upon them, and whether the staffers reasonably relied on those statements to their detriment.

109.   A class action is superior to other available methods for the fair and efficient resolution of this controversy. By bringing these claims together in a single class proceeding, the issues will be efficiently resolved in a single proceeding rather than multiple proceedings. Class certification is a superior method of adjudicating these issues, because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about the defendants' liability for false statements that were made to campaign staffers throughout the nation and the appropriate remedies for such violations.

110.   The factors set forth in Rule 23(b)(3) all support certification.

111.     First, the members of the class have an interest in a unitary adjudication of the issues presented in this action, as opposed to an individual interest in controlling the prosecution of separate actions. Each member of the class is unlikely to have a sufficient amount of individual damages—likely tens of thousands of dollars—to justify pursuing an individual federal court action or to obtain counsel to pursue an individual action.

112.     Second, while several other lawsuits have been filed by members of the putative class regarding the events at issue in this case, including actions in this district, Massachusetts, and Texas, it is appropriate to resolve the putative class members' claims in a single action in this district because New York law may be applied to all of the putative class members (as the Bloomberg campaign has asserted in this action), and all of their legal claims are identical or substantially similar and rely on common evidence.

113.     Third, this is the most appropriate forum for these claims to be litigated, because, among other reasons, jurisdiction and venue are proper, both defendants reside in this district, and the defendants made the false statements to staffers throughout the nation from the Mike Bloomberg 2020 headquarters in this district.

114.     Fourth, there will be no difficulties in managing this case as a class action.

**Rule 23(b)(2)**

115.     This action is also properly maintainable as a class action under Rule 23(b)(2). The defendants have violated the rights of the proposed class members in the same manner and have acted and/or refused to act on grounds generally applicable to the proposed class members, making appropriate declaratory and injunctive relief with respect to the proposed class. The defendants made uniform, false promises to successfully induce the putative class members to join the Bloomberg campaign, and the putative class members detrimentally relied on these promises. The plaintiffs and the proposed class members seek a declaration that the fraudulent inducement

and promissory estoppel challenged in this action are unlawful and they seek an injunction requiring the defendants to make good on their promises to employ the putative class members on the general election to defeat Donald Trump.

**Rule 23(c)(4)**

116.    This action is also properly maintainable as a class action under Rule 23(c)(4). The plaintiffs bring this action to adjudicate particular issues that are appropriate to adjudicate with respect to the defendants, including but not limited to whether the defendants made false promises to the plaintiffs and members of the putative class, whether the plaintiffs relied on such false promises, and whether such promises should be enforced to prevent continuing and additional harm to the plaintiffs and the members of the putative class.

**COUNT I**
**FRAUDULENT INDUCEMENT**
**(On Behalf of the Class Against Mike Bloomberg 2020, Inc.)**

117.    Mike Bloomberg 2020 fraudulently induced the plaintiffs and the members of the putative class to accept employment as field staffers based on the false representation that the nature of the staffers' work would involve both primary and general election work, either working directly for the campaign or another entity established or funded by Bloomberg, regardless of whether Bloomberg won the nomination, and that Michael Bloomberg and the Bloomberg campaign had committed the funds necessary to keep field offices open through November 2020 and employ the staffers on the general election, either working directly for the campaign or another entity established or funded by Bloomberg.

118.    The promise to work on both the primary and the general election and the promise that Michael Bloomberg and the Bloomberg campaign had committed the funds necessary to keep field offices open through November 2020 and employ the staffers on the general election were

31

material existing facts for the plaintiffs and other applicants to accept field staff positions with Mike Bloomberg 2020.

119.   Upon information and belief, these representations were false and known to the defendants as false at the time they were made.

120.   Mike Bloomberg 2020 made these representations to induce the plaintiffs and over 2,000 other persons to accept positions as field staffers, and the plaintiffs and other field staffers reasonably relied on these representations in ignorance of their falsity.

121.   As a result of the foregoing, the plaintiffs and other members of the putative class lost, *inter alia*, income, jobs, job opportunities, and educational opportunities, and have been injured by the defendant campaign's false representations, and are entitled to recover from the defendant amounts to be proven at trial for compensatory damages and punitive damages.

## COUNT II
### Promissory Estoppel
### (On Behalf of the Class Against Mike Bloomberg 2020, Inc.)

122.   The defendant campaign repeatedly promised the plaintiffs and members of the putative class that the nature of the staffers' work would involve both primary and general election work either working directly for the campaign or another entity established or funded by Bloomberg, regardless of whether Bloomberg won the nomination, and that Michael Bloomberg and the Bloomberg campaign had committed the funds necessary to keep field offices open through November 2020 and employ the staffers on the general election, either working directly for the campaign or another entity established or funded by Bloomberg.

123.   In reasonable reliance on these promises, the plaintiffs and members of the proposed class left their jobs to accept positions as field staffers for Mike Bloomberg 2020 and/or did not pursue other offers of employment or postponed educational opportunities in order to accept such positions as field staffers.

124.    In reasonable reliance on clear promises made by the defendant, the plaintiffs and members of the putative class suffered damages.

125.    As a result of the foregoing, the plaintiffs and members of the putative class are entitled to recover from the defendant campaign amounts to be proven at trial for compensatory damages.

**COUNT III**
**FRAUDULENT INDUCEMENT**
**(On Behalf of the Class Against Michael Bloomberg)**

126.    Michael Bloomberg fraudulently induced the plaintiffs and members of the putative class to accept employment as field staffers with his presidential campaign and continue working for that campaign, forego other work or educational opportunities, commit to making themselves available to work on the general campaign through November 2020 for an entity established or funded by Michael Bloomberg, and take other actions to support his candidacy for president, based on the false representations, made by him and on his behalf by others, that the nature of the staffers' work would involve both primary and general election work, either working directly for the campaign or another entity established or funded by Bloomberg, regardless of whether Bloomberg won the nomination, and that Michael Bloomberg and/or the Bloomberg campaign had committed the funds necessary to keep field offices open through November 2020 and employ the staffers on the general election, either working directly for the campaign or another entity established or funded by Bloomberg.

127.    Bloomberg also induced the plaintiffs to take such actions based on his promises, made by him and on his behalf by others, that field staffers' work on the general election would be guaranteed through November 2020, the month that the 2020 general election for president is scheduled to occur, and that he had committed the funding to keep campaign offices open through November 2020 and employ the field staffers through November 2020.

128. The propose to work on both the primary and the general election and Michael Bloomberg, the guarantee that the field staffers would work on the general election through November 2020, and the commitment of funds necessary to keep field offices open through November 2020 and employ the staffers on the general election and through November 2020 were material existing facts for the plaintiffs and other applicants to accept field staff positions with Mike Bloomberg 2020, forego other work or educational opportunities, and commit to making themselves available to work on the general campaign through November 2020 for an entity established or funded by Michael Bloomberg.

129. Upon information and belief, these representations were false and known to Michael Bloomberg as false at the time they were made by Michael Bloomberg and made by others speaking and acting on his behalf and as his agents.

130. These false statements were made both before and after the plaintiffs and other field staffers began working for Mike Bloomberg 2020, Inc.

131. Michael Bloomberg and the others speaking and acting on behalf of Michael Bloomberg as his agent made these representations to induce the plaintiffs and over 2,000 other persons to accept positions as field staff on Bloomberg's campaign and continue working for Bloomberg's campaign, forego other work or educational opportunities, and commit to making themselves available to work on the general campaign through November 2020 for an entity established or funded by Michael Bloomberg, and the plaintiffs and other field staffers reasonably relied on these representations in ignorance of their falsity.

132. As a result of the foregoing, the plaintiffs and other members of the putative class lost, *inter alia*, income, jobs, job opportunities, and educational opportunities, and have been injured by defendant Bloomberg's false representations, and are entitled to recover from the defendant amounts to be proven at trial for compensatory damages and punitive damages.

## COUNT IV
## PROMISORY ESTOPPEL
### (On Behalf of the Class Against Michael Bloomberg)

133.    Michael Bloomberg repeatedly promised the plaintiffs and members of the putative class that that the nature of the staffers' work would involve both primary and general election work, either working directly for the campaign or another entity established or funded by Bloomberg, regardless of whether Bloomberg won the nomination, which would be critical to defeating Donald Trump, and that Michael Bloomberg and/or the Bloomberg campaign had committed the funds necessary to keep field offices open through November 2020 and employ the staffers on the general election, either working directly for the campaign or another entity established or funded by Bloomberg.  He also repeatedly promised that the field staffers' work on the general election would be guaranteed through November 2020, the month that the 2020 general election for president is scheduled to occur, and that he had committed the funding to keep campaign offices open through November 2020 and employ the field staffers through November 2020.

134.    In reasonable reliance on these promises made by Michael Bloomberg and others speaking and acting on behalf of Michael Bloomberg as his agent, the plaintiffs and members of the proposed class accepted employment as field staffers with his presidential campaign and continued working for that campaign, they left, forewent, or did not pursue other work or educational opportunities, or delayed such opportunities, and they committed to making themselves available to work on the general campaign through November 2020 for an entity established or funded by Michael Bloomberg.

135.    In reasonable reliance on clear promises made by Michael Bloomberg, the plaintiffs and members of the putative class suffered damages.

136.   As a result of the foregoing, the plaintiffs and members of the putative class are entitled to recover from defendant Bloomberg amounts to be proven at trial for compensatory damages.

## PRAYER FOR RELIEF

The plaintiffs ask that judgment be entered against Michael Bloomberg and Mike Bloomberg 2020 on all claims and respectfully request that this Court award the following relief:

(a) Certify this case as a class action on behalf of the putative class;

(b) Designate the plaintiffs as representatives of the class;

(c) Designate the plaintiffs' counsel of record as class counsel and/or interim class counsel;

(d) Declare that the defendants are liable to the plaintiffs and the members of the putative class for fraudulent inducement and promissory estoppel;

(e) Enter a preliminary or permanent injunction requiring the defendants to employ the plaintiffs and members of the putative class on and/or through the general election, either directly for Mike Bloomberg 2020, Inc. or another entity established or funded by Michael Bloomberg, and reinstate any benefits that the plaintiffs and putative class members had before they were terminated in March 2020 without any additional conditions for receiving such benefits;

(f) Enter an order requiring the defendants to pay compensatory and punitive damages to plaintiffs and the members of the putative class, and award attorneys' fees and costs; and

(g) Grant such other and further relief as the Court deems proper, appropriate, just, or equitable.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38(b), the plaintiffs demand a trial by jury.

Dated: New York, New York
        July 6, 2020

**GUPTA WESSLER PLLC**                    **EMERY CELLI BRINCKERHOFF
                                          & ABADY LLP**


_/ s / Peter Romer-Friedman_
Peter Romer-Friedman                      Ilann M. Maazel
1900 L Street, NW, Suite 312              David Berman
Washington, DC 20036                      600 Fifth Avenue, 10th Floor
Phone: (202) 888-1741                     New York, New York 10020
peter@guptawessler.com                    (212) 763-5000
.                                         imaazel@ecbalaw.com
                                          dberman@ecbalaw.com

                                          _Attorneys for Plaintiffs and the
                                          Putative Class_