**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

ALEXIS SKLAIR, STERLING RETTKE,
NATHANIEL BROWN, BRIAN GILES,
JOCELYN REYNOLDS, AND CARYN
AUSTEN on behalf of themselves and all
others similarly situated,

       Plaintiffs,

-vs.-

MIKE BLOOMBERG 2020, INC., AND
MICHAEL BLOOMBERG,

       Defendants.

**Case No. 20 Civ. 2495 (KMW) (GWG)**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND MOTION TO STRIKE**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Gupta Wessler PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ...................................................................................ii-v

FRAUD AND A BROKEN PROMISE..........................................................................1

STATEMENT OF FACTS ...........................................................................................2

ARGUMENT ...............................................................................................................7

    I.   Plaintiffs State Claims For Fraudulent Inducement.......................................7

        A.   Plaintiffs Allege that Defendants Made Material Misrepresentations of Present Fact and Material Misrepresentations of Present Intentions ..........7

        B.   Plaintiffs Allege Defendants' Intent to Deceive .........................................9

        C.   Plaintiffs Allege Reasonable Reliance ......................................................12

        D.   All Plaintiffs Allege Non-Speculative Injuries .........................................13

    II.   Plaintiff State Claims For Promissory Estoppel .........................................15

    III.   The Complaint Also States a Claim Against Bloomberg Personally .........................17

        A.   The Amended Complaint Alleges that Mr. Bloomberg Authorized Campaign Staff to Make Promises on his Behalf. .....................................17

        B.   The Amended Complaint Alleges that Mr. Bloomberg Promised to Employ Staffers Through the General Election.........................................20

    IV.   Defendants' Premature Effort to Strike the Class Allegations Should Be Rejected...22

CONCLUSION.............................................................................................................25

TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Adams v. Labaton, Sucharow & Rudoff LLP,*
　No. 07 Civ. 7017, 2009 WL 928143 (S.D.N.Y. Mar. 1, 2010) ....................................... 19

*Bd. Of Trustees ex rel. Gen. Ret. Sys. Of Detroit v. BNY Mellon,*
*N.A.*, No. 11 Civ. 6345, 2012 WL 3930112 (S.D.N.Y. Sept. 10, 2012).......................... 21

*Calibuso v. Bank of Am. Corp.*,
　893 F. Supp. 2d 374 (E.D.N.Y. 2012) ............................................................................. 22

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*,
　4 N.Y.2d 403 (1958) ........................................................................................................ 17

*Chen-Oster v. Goldman, Sachs & Co.*,
　877 F. Supp. 2d 113 (S.D.N.Y. 2012)......................................................................... 23, 24

*Cloke-Browne v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
　No. 10 Civ. 2249, 2011 WL 666187 (S.D.N.Y. Feb. 9, 2011) ........................................ 12

*Colodney v. Continuum Health Partners, Inc.*,
　No. 03 Civ. 7276, 2004 WL 829158 (S.D.N.Y. Apr. 15, 2004)....................................... 13

*Connaughton v. Chipotle Mexican Grill, Inc*.,
　29 N.Y.3d 137 (2017) ...................................................................................................... 15

*Cromer Finance Ltd. v. Berger*,
　137 F. Supp. 2d 452 (S.D.N.Y. 2001).............................................................................. 19

*Davis v. Naviant*,
　No. 17 Civ. 992, 2018 WL 1603871 (W.D.N.Y. Mar. 12, 2018)..................................... 24

*Deerfield Commc'ns Corp., v. Chesebrough–Pond's, Inc.,*
　502 N.E.2d 1003 (N.Y. 1986)............................................................................................ 7

*Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
　No. 06 Civ. 5474, 2008 WL 857492 (S.D.N.Y. Mar. 31, 2008) ...................................... 12

*Devocean Jewelry LLC v. Associated Newspapers Ltd.*,
　No. 16 Civ. 2150, 2016 WL 6135662 (S.D.N.Y. Oct. 19, 2016) ..................................... 18

*Doehla v. Wathne Limited., Inc.*,
　No. 98 Civ. 6087, 2000 WL 987280 (S.D.N.Y. July 17, 2000) ................................. 14, 15

*Ford v. Unity Hospital*,
　32 N.Y. 2d 464 (1973) ..................................................................................................... 20

*Geary v. Hunton & Williams*,
    257 A.D.2d 482 (1st Dep't 1999) .................................................................. 15

*Gruber v. Gilbertson*,
    No. 16 Civ. 9727, 2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019) ..................................... 25

*Herbert Const. Co. v. Cont'l Ins. Co.*,
    931 F.2d 989 (2d Cir. 1991) ..................................................................... 19

*Hoeffner v. Orrick, Herrington & Sutcliffe LLP*,
    61 A.D.3d 614 (1st Dep't 2009) ................................................................. 15

*Hopkins v. Hopkins Envtl. Grp., Inc.*,
    No. 16 Civ. 841, 2017 WL 3217126 (W.D.N.Y. July 28, 2017)......................................... 8

*Hyman v. Int'l Bus. Machines Corp.*,
    No. 98 Civ. 1371, 2000 WL 1538161 (S.D.N.Y. Oct. 17, 2000) ..................................... 13

*Jacobs v. Carsey-Werner Distribution, Inc.*,
     No. 93 Civ. 6825, 1994 WL 116077 (S.D.N.Y. Mar. 30, 1994) ..................................... 16

*Johnson v. Nextel Commc'ns, Inc.*,
    660 F.3d 131 (2d Cir. 2011)....................................................................... 7

*Jones v. Am. Gen. Life & Accident Ins. Co.*,
     213 F.R.D. 689 (S.D. Ga. 2002) ................................................................ 24

*Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*,
    52 N. Y. 2d 105 (1981) ........................................................................ 21

*Katsoolis v. Liquid Media Grp., Ltd.*,
    No. 18 Civ. 9382, 2019 WL 4735364 (S.D.N.Y. Sept. 27, 2019) ................................... 15

*Kaye v. Grossman*,
    202 F.3d 611 (2d Cir. 2000)..................................................................... 16

*Kwon v. Yun*,
    606 F. Supp. 2d 344 (S.D.N.Y. 2009)............................................................ 14

*Laduzinski v. Alvarez & Marsal Taxand LLC*,
     132 A.D.3d 164 (1st Dep't 2015) ............................................................ 8, 13

*Lord v. Marilyn Model Mgmt., Inc.*,
    173 A.D.3d 606 (1st Dep't 2019) ............................................................... 15

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)..................................................................... 10

*Minskoff v. Am. Express Travel Related Servs. Co., Inc.*,
  98 F.3d 703 (2d Cir. 1996)..................................................................... 20

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002)................................................................. 24

*Murphy v. Am. Home Prod. Corp.*,
  448 N.E.2d 86 *(N.Y. 1983)*................................................................... 12

*Pasternak v. Dow Kim*,
  961 F. Supp. 2d 593 (S.D.N.Y. 2013)................................................... 15

*Pearce v. Manhattan Ensemble Theater, Inc.*,
   528 F. Supp. 2d 175 (S.D.N.Y. 2007)............................................. 15, 16

*Press v. Chem. Inv. Servs. Corp.*,
  166 F.3d 529 (2d Cir. 1999)................................................................... 10

*Rather v. CBS Corp.*,
  68 A.D.3d 49 (1st Dep't 2009) .............................................................. 15

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)............................................................. 24, 25

*Rogers v. Town of Islip*,
  230 A.D.2d 727 (2d Dep't 1996) ........................................................... 15

*Sang Lan v. Time Warner, Inc.*,
  No. 11 Civ. 2870, 2013 WL 1703584 (S.D.N.Y. Apr. 19, 2013)................ 21

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)................................................................... 10

*Smalley v. Dreyfus Corp.*,
  10 N.Y.3d 55 (2008) .............................................................................. 15

*Sprague v. Gen. Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998) ................................................................. 24

*Stamelman v. Fleishman-Hillard, Inc.*,
  No. 02 Civ. 8318, 2003 WL 21782645 (S.D.N.Y. July 31, 2003) ............... 9

*Standard Funding Corp. v. Lewitt*,
  89 N.Y.2d 546 (1997) ............................................................................ 19

*Stewart v. Jackson & Nash*,
  976 F.2d 86 (2d Cir. 1992)..........................................................*passim*

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)..................................................................................... 25

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................................................... 24

*U.S. Bank Nat'l Assoc. v. Ables & Hall Builders*,
    696 F. Supp. 2d 428 (S.D.N.Y. 2010).................................................................... 19

*Virola v. XO Commc'ns, Inc.*,
    No. 05 Civ 5056, 2008 WL 1766601 (E.D.N.Y. Apr. 15, 2008)................................. 14

*W.S.A., Inc. v. ACA Corp.*,
    No. 94 Civ. 1493, 1996 WL 551599 (S.D.N.Y. Sept. 27, 1996) ....................................... 9

*Walia v. Veritas Healthcare Solutions, L.L.C.*,
    No. 13 Civ. 6935, 2015 WL 4743542, at *7 (S.D.N.Y. Aug. 11, 2015) ........................... 8

## Other Authorities

Fed. R. Civ. P. 9 ................................................................................................................ 9

N.Y. Gen. Oblig. Law § 15-301 .................................................................................... 17

## FRAUD AND A BROKEN PROMISE

When Michael Bloomberg and Mike Bloomberg 2020, Inc. (the "Campaign") assembled

Mr. Bloomberg's presidential campaign staff, they promised thousands of hardworking field

staff a job on both Bloomberg's presidential primary campaign and on the general election

campaign to support the Democratic nominee for President, whether the nominee was

Bloomberg or another candidate.  Bloomberg and the Campaign (collectively "Defendants") also

promised that Bloomberg had committed the funds necessary to keep the Campaign's offices

open through November 2020, ensuring that these staffers would continue to work on the general

election, irrespective of the results of the primary.

The promise worked.  Thousands of staffers—motivated to work on the general election

to defeat President Trump—left their jobs, relocated, and turned down other professional and

educational opportunities to join the Campaign.  But the promise was a fraud.  When Bloomberg

lost the nomination only two months later, he immediately terminated all of his field staff.

Defendants told the staff that if they wanted to work on the general election, they could apply for

a job with the Democratic National Committee, where they would be given no preference in

hiring.  The same field staff who had halted their careers and given up promising opportunities to

join the Campaign were left deserted in the middle of a global pandemic and economic crisis.

Whether Plaintiffs were at-will employees of the Campaign is irrelevant.  There is no

contract claim here and Plaintiffs do not seek to enforce the terms of any contract.  Once this red

herring of Plaintiffs' at-will employment is put to the side, Plaintiffs plainly state claims for both

fraudulent inducement and promissory estoppel against both Defendants.

Defendants made material misrepresentations of fact when they made false promises

about both the nature of Plaintiffs' job duties as including general election work and the funding

Bloomberg had committed to make that work possible.  Defendants intended to deceive

1

Plaintiffs.  Defendants knew that over 2,000 field staff would not take the risk of joining Bloomberg's last-minute, long-shot primary campaign without the specific promises Defendants made, and they used Bloomberg's wealth and celebrity to widely and effectively disseminate their false assurances.  These false representations and promises had their intended effect: Plaintiffs and over 2,000 other field staff joined the Campaign to pursue this rare opportunity to perform already-funded general election work.  Once the fraud was revealed, Plaintiffs suffered damages.  They had resigned from longstanding jobs with excellent pay and benefits, declined career-building job opportunities, or delayed or forewent educational opportunities.

Plaintiffs uprooted their lives for Bloomberg and his Campaign and have paid a steep price for relying on Defendants' false promises.  Now Defendants must be held accountable.

## STATEMENT OF FACTS

Michael Bloomberg had a problem when he launched his campaign to become the Democratic Party's nominee for President in November 2019.  He was a late entrant into a crowded field of candidates mere months before voters would begin casting their ballots.  Am. Compl. ¶ 42.  He needed to attract field staff to his Campaign immediately if he wanted any chance of building a campaign operation capable of winning the Democratic nomination.  This was a difficult sell.  Democratic "voters would begin casting ballots in the Democratic party" in just months, and without a promise "to perform both primary and general work," staffers would not forego other job opportunities to join a campaign that could be over in a matter of months. *Id.*

### Bloomberg and the Campaign Make the Promise

But Bloomberg and the Campaign had a plan to overcome this problem: offer potential staffers a once-in-a-lifetime opportunity to work on both Bloomberg's primary campaign and the general election campaign to support the Democratic nominee, whether Bloomberg won the

2

nomination or not.  *Id.* ¶ 35.  This 2-for-1 offer became the Campaign's regular hiring pitch.  It repeatedly stated that Bloomberg had committed the funds necessary to keep his Campaign offices open through November 2020 and that field staff were employed to work on both Bloomberg's primary campaign and the general election campaign (either "directly for the Bloomberg campaign or another entity established or funded by Bloomberg") (hereinafter the "Promise").  *Id.* ¶¶ 19-21, 35-36.

As part of the Promise, Campaign officials intended and prospective Campaign field staff understood that, if Bloomberg did not receive the Democratic nomination, he would either continue to operate the Campaign to support the Democratic nominee through the general election, or create or fund another entity to facilitate field staff's continued work for the Democratic nominee.  *Id.* ¶¶ 20, 86-91.  Whether directly through the Campaign or another entity established or funded by Bloomberg personally, the Promise was clear: Bloomberg would pay for all field staff who worked on his primary campaign to work to defeat President Trump in the general election, irrespective of whether Bloomberg won the nomination.  *Id.*

The Promise was widely disseminated by Campaign personnel, who acted as agents of both the Campaign and of Bloomberg.  *Id.* ¶ 36.  The Promise was spread by hiring managers at the Campaign's headquarters in New York City during initial screening interviews, *id.* ¶¶ 22, 26, 29, 36; by regional hiring managers in each state where the Campaign operated, *id.* ¶¶ 19-33, 37; and by Bloomberg himself through national media outlets.  *Id.* ¶¶ 39-40.

The Promise was uniform.  The Campaign's national interview template instructed interviewers to guarantee applicants "Employment through November 2020 with Team Bloomberg (not guaranteed location you are at now)."  *Id.* ¶ 38.  Though staffers' "location" was not guaranteed, they were guaranteed that their jobs would include general election work,

"through November 2020." *Id.* "This guarantee was made at the behest of the campaign and . . . Michael Bloomberg." *Id.* Many field organizers, including Plaintiff Alexis Sklair, were even given Campaign scripts, approved by the Campaign's headquarters, instructing them to inform voters that Bloomberg would support the eventual Democratic nominee and that his field staff would continue to work for the nominee through the general election. *Id.* ¶ 28.

***Plaintiffs Are Induced to Join the Campaign***

This unique Promise was a wild success. Armed with a supposed commitment to fund general election work even if Bloomberg was not the nominee, the Campaign hired over 2,000 field staff from November 2019 to March 2020. *Id.* ¶¶ 96, 120, 131.

Plaintiffs are six of these field staffers who uprooted their lives to accept positions with the Campaign in reliance on this unprecedented Promise. Alexis Sklair relocated from South Carolina to Georgia and turned down an offer of employment from a less-risky local campaign, *id.* ¶ 13; Sterling Rettke abandoned his plans to begin law school in the fall of 2020, *id.* ¶ 14; Nathaniel Brown relocated from Nevada to Utah and withdrew from the advanced stages of a job with the Democratic Congressional Campaign Committee ("DCCC"), a job that was assured through the November general election, *id.* ¶ 15; Brian Giles and Caryn Austen left stable, long-standing corporate jobs with reliable pay and benefits, *id.* ¶¶ 16, 18; Jocelyn Reynolds rejected a position with a guaranteed six-month contract and the potential for significant career advancement, *id.* ¶ 17. All six named Plaintiffs made these life-altering decisions after receiving the Promise directly from Campaign directors and hiring managers who had acted as agents of both the Campaign and Bloomberg personally. *Id.* ¶¶ 19-33.

4

### *The Promise Persists Throughout the Campaign*

Bloomberg and the Campaign continued to perpetuate the Promise from January through March 2020.  Although all field staff were required to enter into at-will employment contracts[1] with the Campaign, but not with Bloomberg personally,[2] Defendants continued to disseminate the Promise widely.  *Id.* ¶¶ 41, 44-47.  Even after Bloomberg dropped out of the primary on March 4, 2020, following a disappointing performance on Super Tuesday, both Bloomberg and the Campaign continued to repeat the Promise within state Campaign operations and national news outlets.  *Id.* ¶¶ 47-58.  And this caused additional harm to the field staff.

For example, Plaintiff Giles turned down a job offer from the Wisconsin Democratic party after the Campaign assured him that he "shouldn't worry" about his job, that resources had already been committed to employ him on the general election, and that Bloomberg and the Campaign were working out the logistics for how to structure field staff's continued employment in a way that comports with campaign finance laws.  *Id.* ¶¶ 50-53.  Plaintiff Reynolds also received the Promise after Bloomberg left the race and even received an email asking if she would be willing to move locations for the general election—a question premised on the Promise that she would be working on the general election.  *Id.* ¶¶ 54-57.

---

[1] Some Plaintiffs were falsely told that it was a legal requirement under state law that their contracts be "at will," as a mechanism to convince them to sign these agreements.  *Id.* ¶ 46.

[2] Although Bloomberg made the personal Promise that he had committed to fund Plaintiffs' general election work, whether through the Campaign or another vehicle, he is not a party to any employment agreements with Plaintiffs or any other field staff.  *Id.* ¶¶ 45, 93.

***Bloomberg and the Campaign Reveal That the Promise Was a Lie***

On March 20, 2020, after four months of repeating the Promise, the Campaign dumped all field staff, including Plaintiffs. *Id.* ¶ 59. They were told they would receive their last paycheck in the next two weeks and all benefits would be terminated. *Id.* Bloomberg would not fund any opportunity for them to work for the Democratic nominee during the general election. *Id.* They could *apply* for jobs with the Democratic National Committee if they wanted to work on the general election, but would not be given any preference in hiring. *Id.* ¶ 60.

Bloomberg and the Campaign never intended to employ Plaintiffs to work on the general election unless he was the nominee. *Id.* ¶¶ 59-61. After relocating and turning down other job and educational opportunities to join Bloomberg and the Campaign, staffers found themselves far from their friends and family, with no paycheck or benefits, in the middle of the worst global pandemic in over 100 years. *Id.* ¶ 62.

All six named Plaintiffs remained unemployed until at least May 2020 and, in some cases, July 2020. *Id.* ¶¶ 73-78. Until the Campaign agreed to provide health insurance in late April for staffers who lacked it (likely as a result of this and other related lawsuits), Plaintiffs were left worrying whether they could afford healthcare in the middle of a pandemic and economic crisis. *Id.* ¶ 65 & p. 2. For example, Plaintiff Austen suffers from a lung condition and was particularly distraught at the prospect of not having health insurance as a novel and dangerous respiratory illness ravaged the world. Am. Compl. ¶ 78. Even once they received new employment, Plaintiffs earned significantly less money than they had been promised by the Campaign and, in some instances, far less money than they were making at the jobs they had left to work for Bloomberg and the Campaign. *Id.* ¶¶ 73-78. Plaintiff Reynolds' family was forced to empty its retirement accounts to cover basic household expenses due to her unanticipated

unemployment. *Id.* ¶ 77. All Plaintiffs would have kept their existing jobs or pursued other, far more stable, available opportunities had they known that the Promise was false. *Id.* ¶¶ 66-72.

Plaintiffs filed suit on behalf of themselves and all similarly situated field staffers to hold Bloomberg and the Campaign accountable for their harmful, false promises. *Id.* ¶¶ 94-116.

## ARGUMENT

### I.      Plaintiffs State Claims For Fraudulent Inducement

To state a claim for fraudulent inducement under New York law, Plaintiffs must allege: "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [Plaintiffs]; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011). Plaintiffs plausibly allege each of these elements against both the Campaign and Bloomberg personally.

### A.      Plaintiffs Allege That Defendants Made Material Misrepresentations Of Present Fact And Material Misrepresentations Of Present Intentions

Plaintiffs have amply pled a "material misrepresentation of a presently existing fact" under two distinct theories.

*First*, Defendants misrepresented both the resources they had *already* committed to the general election and the nature of the work Plaintiffs would be performing for Defendants.

New York Courts draw a distinction between non-actionable "'promissory statement[s] as to what will be done in the future,'" and actionable "'representation[s] of present fact.'" *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (quoting *Deerfield Commc'ns Corp., v. Chesebrough–Pond's, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986)). A statement regarding a current commitment of resources towards a future goal is not a future promise, but a statement of "present fact" actionable for fraud. *Id.* (law firm's statements to job applicant that it had "recently secured a large environmental law client" and that the law firm was "in the process of

7

establishing an environmental law department" in which Plaintiff would work were actionable statements of present fact).

A knowing misrepresentation regarding "the *nature of the work*" a future employee will be doing is also an "actionable statement[] of present fact." *Laduzinski v. Alvarez & Marsal Taxand LLC*, 132 A.D.3d 164, 166 (1st Dep't 2015) (emphasis added); *Walia v. Veritas Healthcare Solutions, L.L.C.*, No. 13 Civ. 6935, 2015 WL 4743542, at *7 (S.D.N.Y. Aug. 11, 2015) (element of fraudulent inducement claim satisfied where "defendants' description of the job and the nature of [defendants' business] were fraudulent."); *Hopkins v. Hopkins Envtl. Grp., Inc.*, No. 16 Civ. 841, 2017 WL 3217126, at *4 (W.D.N.Y. July 28, 2017) (denying motion to dismiss fraudulent inducement claim based on Defendant's "concrete statement regarding the *nature of the job* that Plaintiff was interviewing for") (emphasis added).

Defendants misrepresented both the resources that had already been committed to the general election *and* the nature of the job Plaintiffs would do.  As part of the Promise, Defendants repeatedly stated: (1) that Bloomberg had committed the resources to keeping Campaign offices open through the general election in 2020, *see* Am. Compl. ¶¶ 21-33, 35-36, 39-42, 52-53, 58, 79; and (2) that Plaintiffs were hired to work on not only Bloomberg's primary election campaign, but also on the general election campaign to support the Democratic nominee for President, *see id* ¶¶ 21-33, 35-40, 42, 51-55, 79-80.  These statements about Defendants' present commitment of resources and the specific nature of the work are both actionable statements of present fact for which Defendants are liable.

*Second*, Defendants made a material misrepresentation of their present intentions.  Even future promises are actionable when they reflect a misrepresentation of the Defendants' "present intentions." *Laduzinski*, 132 A.D.3d at 168.  That is, a plaintiff may state a claim for fraud if she

alleges that a defendant knew when it made a future promise that it "did not intend to fulfill" that promise. *Stewart*, 976 F.2d at 89 (internal quotation marks and citation omitted); *see also Stamelman v. Fleishman-Hillard, Inc.*, No. 02 Civ. 8318, 2003 WL 21782645, at *6 (S.D.N.Y. July 31, 2003) (promises about plaintiff employee's title, salary, and budget, with no intention to fulfill them, were actionable for  fraudulent inducement); *W.S.A., Inc. v. ACA Corp.*, No. 94 Civ. 1493, 1996 WL 551599, at *7 (S.D.N.Y. Sept. 27, 1996) (denying motion to dismiss when defendant "knew its representation was false or alternatively was made with reckless disregard for the truth" at the time it was made).

Accordingly, Plaintiffs' allegations that Defendants never had any intention of keeping the Promise also states a fraudulent inducement claim.  Am. Compl. ¶¶ 79, 92.  Actions speak louder than words.  Defendants' near-immediate dismissal of its entire field staff once it became clear that Bloomberg would not become the Democratic nominee alone creates a reasonable inference that Defendants never intended to pay the field staff to work on the general election campaign to support a presidential nominee other than Bloomberg.  These allegations of Defendants' fraudulent "present intentions," which must be accepted as true, are all the more plausible because there was no material change in Defendants' ability to honor the Promise between the time it was made and the time that it went unfulfilled.  *Id.* ¶¶ 63-64.  At a minimum, it is plausible that Defendants never had any intention of fulfilling the Promise if Bloomberg did not win the primary, and Plaintiffs are entitled to probe these intentions in discovery.

### B.    Plaintiffs Allege Defendants' Intent To Deceive

In claiming that Plaintiffs have not alleged an intent to deceive, Defendants distort both the pleading standards and the allegations in the Amended Complaint.  Though Rule 9(b) requires a strong inference of fraudulent intent, it provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  As the

9

Second Circuit has explained, "[w]hile Rule 9(b) requires that the circumstances constituting fraud be state[d] with particularity, it does not require factual pleadings that demonstrate the *probability* of wrongdoing." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171, 174 (2d Cir. 2015) (internal quotation marks omitted). "At the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Id.* at 174; *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences.").

As Defendants admit, this lenient pleading standard on intent is satisfied if Plaintiffs allege that Defendants had both "motive and opportunity to commit fraud." Defs.' Br. 13; *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Plaintiffs' allegations easily satisfy this low standard. As to motive: Bloomberg was a late entrant into a crowded primary race. Defendants desperately needed to procure thousands of field staffers in a matter of weeks. Am. Compl. ¶¶ 42, 79-80. Defendants needed to convince prospective field staff to relocate, leave their jobs, and forego other opportunities to join Bloomberg's last minute, long-shot campaign, which, if unsuccessful, could be over in a matter of months. *Id.* These allegations are more than sufficient to supply Defendants with a "motive" to concoct their fraudulent Promise. Through the Promise, the Campaign took its biggest weakness (that Bloomberg's primary campaign might only last 2 to 3 months) and turned it into unprecedented strength by ensuring that his field staff would work to elect a Democratic in November, regardless of what happened in a wide-open primary. As a result of this Promise, rather than waging his campaign with the tiny field staff he had in November 2019—which would have made his campaign a futile gesture like other late and underfunded entrants in the

primary[3]— Bloomberg's false Promise allowed him to proceed with the staff he needed to have a chance at winning.

Defendants also had the opportunity to commit this fraud.  Bloomberg is a well-known national figure, a billionaire former New York City mayor.  Defendants used his celebrity to spread the false Promise across numerous national media outlets, in addition to ensuring that all applicants were informed of the Promise during their interviews with the Campaign.  *Id.* ¶¶ 2, 12, 21-33, 36-41, 51-58, 61.  Part of Bloomberg's fame is for his immense wealth, which only furthered his "opportunity" to commit fraud.  *Id.* ¶ 64.  While the Promise of committing sufficient resources to employ thousands of staffers through November would be an enormous expense, Defendants capitalized on Bloomberg's unlimited wealth and his perceived desire to defeat President Trump to make his Promise believable.  *Id.* ¶¶ 34-35.

Defendants make the outlandish suggestion that they had no intent to deceive because they would have kept their Promise had Bloomberg won the nomination.  Defs' Br. 14 (stating that the Promise was made in a "good faith effort *to win the Democratic nomination*" but was "re-ass[ed]" after "considering the election results on Super Tuesday") (emphasis added).  This misses the point.  A material element of the Promise was that Plaintiffs would work on the general election *whether or not Bloomberg won the nomination*.  Am. Compl. ¶¶ 21-33, 35, 37-42, 51-58.  Defendants' swift dismissal of their entire field staff once Bloomberg lost raises the plausible inference that this material aspect of the Promise was never true.  It was a ploy to entice field staff to make the sacrifices needed to join the Campaign despite its potentially short shelf life.

---

[3] *See* Stephanie Saul & Maggie Astor, "Deval Patrick, Latecomer to the 2020 Race, Drops Out", N.Y. Times (Feb. 12, 2020), https://www.nytimes.com/2020/02/12/us/politics/deval-patrick-drops-out.html (contrasting the last-minute presidential campaigns of former Governor Deval Patrick and Bloomberg).

Defendants concede that, "taking Plaintiffs' allegations as is," Defendants' inference of

no deceitful intent is merely "equally compatible" with an inference of deceitful intent.  Defs.'

Br. 14.  But as the Second Circuit has held, "[a]t the pleadings stage, the alleged fraud need only

be plausible based on the complaint; it *need not be more likely* than other possibilities."  *Loreley*,

797 F.3d at 174 (emphasis added).  Plaintiffs have alleged intent to deceive based on this

concession alone.[4]

### C.    Plaintiffs Allege Reasonable Reliance

Plaintiffs reasonably relied on Defendants' false Promise when they chose to leave their

jobs, turn down other employment or educational opportunities, and relocate in order to join and

remain with the Campaign.  Am. Compl. ¶¶ 21-34, 51-57.  Defendants do not challenge the

sufficiency of Plaintiffs' well-pleaded allegations on reliance.  Instead they claim, as a matter of

law, that at-will employees can never reasonably rely on a promise of future employment.  Defs.'

Br. 7-9.  This argument fails for two reasons.

First, as discussed above, Plaintiffs do not allege that they relied on a "future promise" of

employment.  To the contrary, they relied on Defendants' multiple misrepresentations of both

present facts and of the Campaign's present intentions as to the nature of the job, and

Defendants' past and present commitment of resources to the job.  *See supra* Part I.A.

Second, the legal doctrine on which Defendants rely only applies when a Plaintiff seeks

damages arising "directly from the termination itself."  *Stewart*, 976 F.2d at 88 (distinguishing

*Murphy v. Am. Home Prod. Corp.,* 448 N.E.2d 86 (N.Y. 1983)).  But Plaintiffs seek damages

---

[4] Defendants' reliance on *Cloke-Browne v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 10 Civ. 2249, 2011 WL 666187, (S.D.N.Y. Feb. 9, 2011), and *Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 06 Civ. 5474, 2008 WL 857492 (S.D.N.Y. Mar. 31, 2008), is misplaced.  In *Cloke-Brown*, the plaintiffs had failed to allege the time and place of the fraudulent statements and had not made any allegations "demonstrating that the Individual Defendants had both motive and opportunity to commit fraud." 2011 WL 666187, at *5.  *Deluca* was decided after summary judgment and, even then, the plaintiff had adduced no evidence that the statements in question were false.  2008 WL 857492, at *16.

arising from the jobs and educational opportunities they gave up to join and, at certain points, to remain with, the Campaign due to Defendants' fraudulent Promise.  Am. Compl. ¶¶ 13-18, 51-57.  This distinction between non-actionable claims seeking damages arising from termination, and actionable claims arising from a decision to forego other professional opportunities on the basis of a false promise, is well-established under New York law.  *See, e.g.*, *Stewart*, 976 F.2d at 88; *Colodney v. Continuum Health Partners, Inc.*, No. 03 Civ. 7276, 2004 WL 829158, at *10 (S.D.N.Y. Apr. 15, 2004) (Plaintiff stated fraud claim "to the extent that he alleges that he relied on [defendant's false representation] . . . in making his decision to accept the CIO position"); *Hyman v. Int'l Bus. Machines Corp.*, No. 98 Civ. 1371, 2000 WL 1538161, at *2-3 (S.D.N.Y. Oct. 17, 2000) (collecting post-*Stewart* federal cases applying New York law); *Laduzinski*, 132 A.D.3d at 168 (defendant's fraudulent action "preceded [] termination" when it misrepresented "the nature of the job that they were hiring [at-will plaintiff] to do").

Plaintiffs' status as at-will employees is merely a limitation on the categories of damages that Plaintiffs can seek, not whether they can state a claim.  And Plaintiffs plainly state a claim.

### D.    All Plaintiffs Allege Non-Speculative Injuries

Defendants concede that Plaintiffs Giles and Austen alleged compensable injuries.  Defs.' Br. 14 n.10.  But *all* of the Plaintiffs have alleged compensable injuries due to the Campaign's fraudulent Promise.

Contrary to Defendants' claims, New York's "out of pocket rule" does not limit damages for fraud solely to the loss of prior employment.  Defs.' Br. 15-17.  In *Stewart*, the Second Circuit rejected this narrow interpretation of the out of pocket rule, recognizing that a plaintiff fraudulently induced into new at-will employment could seek compensation not just for the financial loss caused by leaving her prior job, but for damage to her "career development."  976

F.2d at 88.  Following *Stewart*, district courts in this Circuit have rejected the exact same

argument advanced by Defendants here.

For example, in *Doehla v. Wathne Limited., Inc.*, No. 98 Civ. 6087, 2000 WL 987280

(S.D.N.Y. July 17, 2000), the defendant employer made the same argument made by Defendants,

that, even after *Stewart*, the out of pocket rule precluded an employee from recovering damages

for rejecting an alternative job offer as a result of defendant's fraud.  *Id.* at *6 (internal quotation

marks omitted).  Though recognizing that the out of pocket rule prevents claims for "speculative

and remote" damages, the district court held that the defendant's proposed categorical bar on

damages for alternative foregone employment "paint[s] with too broad a brush."  *Id.*  Instead, the

court held that "whether a particular loss is uncompensable because [it is] too speculative or

remote" turns on the relevant facts.  *Id.*  The court denied the defendant's motion to dismiss: "if

the proof is there, a defrauded plaintiff may base a claim for actual pecuniary loss upon an

economic opportunity that defendant fraudulently induced him to forego."  *Id.*; *see also Virola v.*

*XO Commc'ns, Inc.*, No. 05 Civ. 5056, 2008 WL 1766601, at *15 (E.D.N.Y. Apr. 15, 2008) ("if

a reasonable jury can find that the plaintiffs forwent valuable employment opportunities due to

[defendant's] misrepresentations . . . the plaintiffs' fraudulent inducement claim can survive

summary judgment."); *Kwon v. Yun*, 606 F. Supp. 2d 344, 361 (S.D.N.Y. 2009) (Lynch, J.)

(referring to the "loss of professional opportunity and reputation" as a separate source of

damages from the "loss of benefits flowing from one's previous employment").

Plaintiffs Sklair, Rettke, Brown, and Reynolds have met this standard by alleging that

they forewent valuable employment and career development opportunities.  Sklair and Reynolds

both turned down other concrete employment opportunities, including in Reynolds' case an offer

with a six-month guaranteed contract.  Am. Compl. ¶¶ 13, 67 (Sklair); *id.* ¶¶ 17, 71 (Reynolds).

Brown withdrew from the late stages of a far more stable political job with the DCCC and has

been unable to obtain a job in politics to further his career development since then. *Id.* ¶¶ 15, 68,

75. Rettke postponed applying to law school by a year, *id.* ¶¶ 14, 74, a result that by definition

hampers his ability to further his prospective career as a lawyer. At a minimum, these

allegations raise the plausible inference of compensable damages; this inquiry should be resolved

in discovery. *Doehla*, 2000 WL 987280 at *6.[5]

## II.      Plaintiffs State Claims For Promissory Estoppel

Plaintiffs have also stated claims for promissory estoppel. Defendants' claim that

promissory estoppel never applies in the employment context is wrong. New York courts and

courts in this District routinely allow such claims to go forward. *See, e.g.*, *Lord v. Marilyn

Model Mgmt., Inc.*, 173 A.D.3d 606, 607 (1st Dep't 2019); *Rogers v. Town of Islip*, 230 A.D.2d

727, 728 (2d Dep't 1996); *Katsoolis v. Liquid Media Grp., Ltd.*, No. 18 Civ. 9382, 2019 WL

4735364, at *4 (S.D.N.Y. Sept. 27, 2019); *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F.

Supp. 2d 175, 181 (S.D.N.Y. 2007) (Wood, J.).

Plaintiffs' promissory estoppel claims should move forward for largely the same reasons

as their fraudulent inducement claims. To state a claim for promissory estoppel, Plaintiffs must

allege "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that

---

[5] The cases upon which Defendants rely all involved either far more speculative assertions of damages than the concrete employment and educational opportunities forgone by Plaintiffs here, or were decided after the full benefit of discovery. *See Connaughton v. Chipotle Mexican Grill, Inc.*, 29 N.Y.3d 137, 143, (2017) (Plaintiff alleged only that, as a result of Defendant's fraud he "stopped soliciting other [] buyers," not that "he rejected another prospective buyer's offer"); *Rather v. CBS Corp.*, 68 A.D.3d 49, 58 (1st Dep't 2009) (plaintiff  failed to "identif[y] a single opportunity with specified terms that was actually available to him and which he declined to accept because of [defendant's] actions"); *Pasternak v. Dow Kim*, 961 F. Supp. 2d 593, 597 (S.D.N.Y. 2013) (at-will employee sought damages for discretionary bonuses he may have been awarded over 5-year period at alternative at-will employment); *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, 61 A.D.3d 614, 615  (1st Dep't 2009) (viability of damages assessed at summary judgment); *Geary v. Hunton & Williams*, 257 A.D.2d 482, 482 (1st Dep't 1999) (same). Moreover, the New York Court of Appeals has "declin[ed] to adopt[] or reject[]" the Second Circuit's rationale in *Stewart*. *Smalley v. Dreyfus Corp.*, 10 N.Y.3d 55, 59 (2008). To the extent intermediate state appellate courts have taken a narrower view of the out of pocket rule than the Second Circuit, this Court is bound by the Second Circuit's interpretation of New York law. *Doehla*, 2000 WL 987280, at *7.

promise; and (3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

**Promise**.  Defendants made the clear and unambiguous Promise that Bloomberg had committed resources to keeping Campaign offices open through the general election in November, Am. Compl. ¶¶ 21-33, 35-36, 39-42, 52-53, 58, 79, and that Plaintiffs were hired to work on the general election campaign to support the Democratic nominee for President (whoever that turned out to be), in addition to working on Bloomberg's primary campaign. *Id.* ¶¶ 21-33, 35-40, 42, 51-55, 79-80; *see supra* Part I.A.

**Reliance**.  Plaintiffs reasonably and foreseeably relied on the Promise when they left their prior jobs and turned down other valuable employment or educational opportunities in order to join and remain with Bloomberg and the Campaign.  Am. Compl. ¶¶ 21-34, 51-57.  Plaintiffs' reliance was not only foreseeable; it was the entire reason Defendants made these intentional misrepresentations.  *Id*. ¶¶ 42, 79-80; *supra* Part I.B.  Though Defendants again argue that Plaintiffs cannot state a claim because they were at-will employees, Defs.' Br. 6-7, they are again wrong—an at will contractual provision only affects the damages Plaintiffs may seek, not the viability of their claim.  *See supra* Part I.C.

**Injury**.  Plaintiffs were injured as a result of their reliance on the Defendants' Promise. Am. Compl. ¶¶ 13-18, 66-72; *supra* Part I.D.

The Campaign incorrectly insists that Plaintiffs must plead an "unconscionable injury," Defs' Br. 9, but that standard only applies when promissory estoppel is asserted as a defense to the statute of frauds, *see Pearce*, 528 F. Supp. 2d at 18; *Jacobs v. Carsey-Werner Distribution, Inc.*, No. 93 Civ. 6825, 1994 WL 116077, at *5 (S.D.N.Y. Mar. 30, 1994).  As Defendants admit, the statute of frauds is only relevant when a plaintiff asserts that an oral promise modifies the

terms of a written offer letter.  Defs.' Br. 9; N.Y. Gen. Oblig. Law § 15-301(1).  But Plaintiffs do

not seek to modify their employment contracts that contained at-will clauses.  Rather, they seek

to hold the Campaign liable for the false promises that induced them to enter into those contracts

in the first place.  The statue of frauds in not implicated by Plaintiffs' allegations of deceit that

predate any written agreement.  *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d

403, 408 (1958).  No allegation of "unconscionable injury' is required.

### III.    The Complaint Also States a Claim Against Bloomberg Personally

Defendants also seek to dismiss all claims against Bloomberg himself.  They claim that

the Amended Complaint fails to allege either that "Mr. Bloomberg authorized any Campaign

staff to make promises on his behalf" or "that Mr. Bloomberg misrepresented any facts or made

any specific promises" concerning the Plaintiffs' employment himself.  Defs.' Br. 16.  Neither

claim is correct.

### A.    The Amended Complaint Alleges that Mr. Bloomberg Authorized Campaign Staff to Make Promises on his Behalf.

Defendants' effort to divorce Bloomberg from the promises made by the Campaign fails.

Regardless of Bloomberg's own promises discussed below, Bloomberg is individually liable

because Campaign officials who made the Promise did so "*as agents of Michael Bloomberg* and

the Bloomberg campaign, with express, implied, or apparent authority to make such promises or

statements."  Am. Compl. ¶ 91 (emphasis added); *see also id.*  ("all of the promises and

statements that the campaign officials made or directed their employees to make were expressly

authorized by Michael Bloomberg."); *id.* ¶ 19 ("every promise and statement that a campaign

official or staffer made to the plaintiffs . . . was made as an agent of the campaign *and* Michael

Bloomberg"); *id.* ¶ 92 ( "Michael Bloomberg knew that all of these promises were false at the

time that he and/or his campaign managers and officials made them on his behalf and as his agent."); *id.* ¶ 36.

Defendants suggest that the Campaign, funded and run by Bloomberg, might have gone rogue: "no facts demonstrate[e] that Mr. Bloomberg granted any Campaign employees" the "authority to make promises as agents on Mr. Bloomberg's behalf," they say.  Defs.' Br. 19. Although they admit that campaign staff "suggested to Plaintiffs that they had the authority to make binding promises on behalf of Mr. Bloomberg personally," they claim any theory of apparent authority fails because the Amended Complaint "do[es] not allege that Mr. Bloomberg ever affirmatively communicated directly to [the plaintiffs] that Campaign staff had any such authority."  Defs.' Br. 19.  This argument is wrong for several reasons.

First, Bloomberg ignores the Amended Complaint.  The Complaint alleges repeatedly that the Promise was "expressly authorized by Michael Bloomberg."  Am. Compl. ¶¶ 91; *see id.* ¶¶ 19, 36, 92.  Bloomberg cannot defeat the Amended Complaint by contradicting or casting doubt on its allegations, because at this stage "[t]he Court must accept as true all well-pleaded factual allegations in a complaint and draw[ ] all inferences in the plaintiff's favor."  *Devocean Jewelry LLC v. Associated Newspapers Ltd.*, No. 16 Civ. 2150, 2016 WL 6135662, at *2 (S.D.N.Y. Oct. 19, 2016) (Wood, J.) (internal quotation marks and citation omitted).

Second, Bloomberg's claim is not merely implausible, but outlandish.  Of course the Bloomberg Campaign had "authority to make promises as agents on Mr. Bloomberg's behalf." Defs.' Br. 19.  He ran it.  He funded it.  He was the candidate and the principal of the Campaign. Bloomberg is liable for promises made by his Campaign on his behalf.

Third, a plaintiff need not allege that the principal "affirmatively communicated directly" to the plaintiffs anything about an agent's authority, as Defendants claim.  Defs.' Br. 19.  It is

enough that "words or conduct of the principal" were "communicated to a third party" that "g[ave] rise to the appearance and belief that the agent possesses authority to enter into a transaction on behalf of the principal." *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 486 (S.D.N.Y. 2001) (quoting *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 551 (1997)).  What matters is whether a third party relied on "the misrepresentations of the agent because of *some misleading conduct on the part of the principal*." *Adams v. Labaton, Sucharow & Rudoff LLP*, No. 07 Civ. 7017, 2009 WL 928143, *4 (S.D.N.Y. Mar. 1, 2010) (quoting *Herbert Const. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993 (2d Cir. 1991)) (emphasis in original).  "Where a third party has reasonably relied on the principal's words or conduct," the "appearance of authority binds the principal." *Cromer Finance*, 137 F. Supp. 2d at 486–87 (internal quotation marks and citations omitted); *see also U.S. Bank Nat'l Assoc. v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 439 (S.D.N.Y. 2010) (apparent authority "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations") (internal quotation marks and citation omitted).

Applying this correct standard, the Amended Complaint plainly states a claim.  It alleges that Mr. Bloomberg repeatedly pledged that he and his campaign would hire staffers "to work on both the primary campaign of Michael Bloomberg and the general election campaign of whomever won the Democratic nomination for president," and that plaintiffs "relied on Michael Bloomberg's promises of guaranteed employment through November 2020."  Am. Compl. ¶¶ 29, 89; *see also id.* ¶ 33 (detailing how campaign officials promised that work on the campaign "would involve both primary and general election work, and that Michael Bloomberg and the campaign had committed to fully funding offices and staff through the end of the general

election cycle").  These allegations foreclose Defendants' attempt to dismiss the claims against

Bloomberg because they create, at minimum, "a question of fact" on "[t]he existence of apparent

authority."  *Minskoff v. Am. Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708 (2d Cir.

1996); *Ford v. Unity Hospital*, 32 N.Y. 2d 464, 473 (1973) ("the existence of apparent authority

depends on a factual showing that the third party relied upon the misrepresentations of the agent

because of some misleading conduct on the part of the principal") (internal quotation marks

omitted).

> **B.  The Amended Complaint Alleges that Mr. Bloomberg Promised to Employ Staffers Through the General Election.**

Defendants also claim that plaintiffs "do not allege any clear and unambiguous promise

by Mr. Bloomberg."  Defs.' Br.16.

But, in addition to authorizing his Campaign to speak on his behalf, the Amended

Complaint also alleges that Bloomberg made the very same Promise himself.  *See, e.g.*, Am.

Compl. ¶ 29 ("in mid-January 2020," Mr. Giles "received th[e] same message—that he was

being hired to work on both the primary campaign of Michael Bloomberg and the general

election campaign of whomever won the Democratic nomination for president, whether it was

Bloomberg or another candidate—both through public statements from Michael Bloomberg

himself and from other campaign aides at campaign headquarters in New York, with whom he

spoke with over the phone as part of the interview and recruitment process"); *id.* ¶ 40 ("Michael

Bloomberg and the campaign's promises that they had committed the funds to keep open and

finance field offices and employ field staffers through the general election were consistent with

public reports, which the plaintiffs and other field staff applicants believed to be true

representations.").  These allegations are supported by contemporaneous reporting.  *See, e.g. id.*

40 (quoting January 10, 2020 article noting that Mr. Bloomberg "has committed to paying" the

"roughly 500" campaign members "through November").[6]  That is all that's required to reject the Defendants' threshold attack on the sufficiency of Plaintiffs' allegations.

Defendants next claim that Bloomberg's statements made in the press cannot, as a matter of law, "constitute a 'clear and unambiguous promise' to individual Campaign employees." Defs.' Br. 16-17.  No authority supports this view.  Under New York law, a promise is no less enforceable if made publicly than if made privately, and is no less enforceable if made to many or to just one.  What matters instead is whether the alleged promise is "sufficiently certain and specific so that what was promised can be ascertained."  *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N. Y. 2d 105, 109 (1981).

Defendants' cases make this very point.  In *Sang Lan v. Time Warner, Inc.*, No. 11 Civ. 2870, 2013 WL 1703584 (S.D.N.Y. Apr. 19, 2013), for instance, the court rejected the alleged promise not because it was made repeatedly in the press (it was), but because it was "too vague to spell out a meaningful promise"—all the defendants had reportedly said was that they would "secure" the plaintiff's future.  *Id.* at *4-5 (quotation marks and citation omitted).  In *Bd. Of Trustees ex rel. Gen. Ret. Sys. Of Detroit v. BNY Mellon, N.A.*, No. 11 Civ. 6345, 2012 WL 3930112, at *6 (S.D.N.Y. Sept. 10, 2012), the court again rejected an alleged promise, not because it had been made publicly (it had) or because it had been made broadly in marketing materials, but because it was "too indefinite and vague to constitute a 'clear and unambiguous promise'"—the alleged statements were limited to "promotional" representations containing general claims about the "low-risk" nature of a particular investment vehicle.  *Id.* at *7.

---

[6] The contemporaneous reporting of Mr. Bloomberg's unambiguous promise was widespread.  As senior campaign officials repeatedly explained, it "was Mike's idea" to hire campaign staff "through November" regardless of whether "they're working for us" or "if they're not."  Joe Hagan, *"We're Going to Spend Trump Out of Office": Bloomberg's Campaign Manager on Why Mike is Still the Democratic Savior,"* Vanity Fair (Feb. 24, 2020), https://www.vanityfair.com/news/2020/02/bloombergs-campaign-manager-on-why-mike-is-stillthe- democratic- savior.

21

Defendants do not directly challenge the specificity of the alleged statements here, and for good reason.  The statements are more than sufficient to state a claim at the pleading stage. Unlike the statements in Defendants' cases—which contained nothing specific about the nature, duration, or scope of the alleged promises—Bloomberg's statements were neither indefinite nor vague.  He pledged that staffers were "being hired to work on both the primary campaign of Michael Bloomberg and the general election campaign of whomever won the Democratic nomination for president, whether it was Bloomberg or another candidate."  Am. Compl. ¶ 29; *see also id*. ¶ 40 (noting Mr. Bloomberg's promise to "commit[] the funds to keep open and finance field offices and employ field staffers through the general election").  This, standing alone, is enough to defeat Defendants' bid to dismiss the claims against Bloomberg.[7]

## IV.    Defendants' Premature Effort to Strike the Class Allegations Should Be Rejected

Defendants concede, correctly, that "motions to strike class allegations are disfavored." Defs.' Br. 21.  Yet in support of this argument, Defendants offer nothing more than several generic arguments that resolving the claims "would require highly individualized inquiries." *See, e.g.*, Defs.' Br. 22-25 (arguing that "proving that the Campaign made a clear and unambiguous promise" or "material misrepresentations of present fact" would "require inquiries into each putative class member's individualized communications with the Campaign.").  That is not enough to justify striking the class allegations.  As courts in this circuit have long made clear, so long as a plaintiff's class allegations are plausible, a motion to strike must be denied. *Calibuso v. Bank of Am. Corp.*, 893 F. Supp. 2d 374, 388 (E.D.N.Y. 2012) (rejecting an attempt "to have this Court . . . conduct the rigorous Rule 23(a) class certification analysis at the pleading

---

[7] Defendants repeat their argument that the Amended Complaint's allegations against Mr. Bloomberg fail to satisfy the heightened-pleading standard for fraud claims.  That argument fails for the same reason explained above.  *See supra* Part I.B.

stage before the plaintiffs have been given an opportunity to set forth their proof"); *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) ("motions of this kind are deemed procedurally premature" unless they address issues "separate and apart from the issues that will be decided on a class certification motion") (quotation marks and citation omitted).[8]

The Amended Complaint plausibly identifies multiple questions that will generate common answers as to the class, including: (1) whether Defendants made the false Promise; and (2) whether the Promise was made for the purpose of inducing the field staff to rely upon it. Am. Compl. ¶ 98; *see also id*. ¶¶ 99-100 (other common questions include whether staffers "were promised a guarantee of employment [i]n the general election, whether directly with the campaign or through another entity established or funded by Bloomberg personally, through November 2020").

The Promise was uniform.  The Campaign created an interview template, for the whole country, instructing interviewers to guarantee applicants "Employment through November 2020 with Team Bloomberg."  *Id.* ¶ 38; *see, e.g.*, *id.* ¶ 115 ("defendants made uniform, false promises to successfully induce the putative class members to join the Bloomberg campaign, and the putative class members detrimentally relied on these promises."); *id*. ¶ 28-31 (noting the uniform message conveyed to staffers and voters that hiring would be for "both primary and general work," and that "this promise—that field organizers were being hired to not just do primary work but also general election work—came from the Bloomberg campaign's headquarters in New York and was being disseminated regionally at the campaign's express direction").

Defendants may attempt to challenge that allegation after discovery.  But they cannot shoehorn a potential, future (and manufactured) factual disagreement into a motion to strike class

---

[8] Defendants do not even identify what specific elements of Rule 23(a) or Rules 23(b)(2), 23(b)(3), or 23(c)(4) cannot be satisfied. This is also fatal to their motion.

allegations at the pleadings stage.  To the contrary, that is "exactly the sort of issue that would be litigated and decided in the context of a motion for class certification."  *Chen-Oster*, 877 F. Supp. 3d at 117.

Defendants' own cases illustrate the point.  In *Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002), for example, the Second Circuit addressed all the relevant questions raised by Defendants here—including predominance in the context of a set of fraud claims—at the Rule 23 stage, *not* the pleadings stage.  *Id.* at 1253.  All but *one* of the fifteen cases cited by Defendants that addressed the issues of predominance and commonality were decided at the class certification stage, not the pleadings stage.[9]  *See, e.g.*, *Jones v. Am. Gen. Life & Accident Ins. Co.*, 213 F.R.D. 689, 702 (S.D. Ga. 2002) (addressing the issues at class certification, not at the pleadings stage); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998) (same). That is unsurprising: these issues are not appropriate for resolution now.

Finally, the Court should reject Defendants' argument that the need to calculate each class member's individual damages defeats class certification.  Their argument is "contrary to the law of this Circuit . . . that individualized damages determinations alone cannot preclude certification," *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015), as well as the Supreme Court's recent decision in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When *one or more* of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, *such as damages* or some affirmative

---

[9] In the single case where these issues were addressed at the pleadings stage, *Davis v. Naviant*, No. 17 Civ. 992, 2018 WL 1603871 (W.D.N.Y. Mar. 12, 2018), the complaint failed to allege that the defendants made any uniform representation to the plaintiffs and so the court held that class certification would have been impossible based on the face of the complaint.  *Id.* at *7.  But as the Second Circuit has explained, where fraud claims are "based on uniform misrepresentations," the claims "are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof."  *Moore*, 306 F.3d at 1253.

defenses peculiar to some individual class members.") (quotation marks and citation omitted) (emphasis added).

Moreover, to satisfy predominance under Rule 23(b)(3), all that plaintiffs need to show is "'that their damages stemmed from the defendant's actions that created the legal liability,'" *Gruber v. Gilbertson*, No. 16 Civ. 9727, 2019 WL 4439415, at *8 (S.D.N.Y. Sept. 17, 2019) (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015)), not that damages can "'be measured on a classwide basis,'" *id.* (quoting *Roach*, 778 F.3d at 407).  At the proper time, when a class certification motion is filed after discovery, Plaintiffs will have no difficulty showing that their damages stem from the same action (the false Promise) that creates legal liability in this case.  As such, there is no basis to strike the class at the outset of the litigation.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and motion to strike Plaintiffs' class allegations should be denied.

25

Dated: New York, New York
       August 31, 2020

**GUPTA WESSLER PLLC**

Peter Romer-Friedman
1900 L Street, NW, Suite 312
Washington, DC 20036
Phone: (202) 888-1741
peter@guptawessler.com

Matthew Wessler*
1035 Cambridge Street, Suite One
Cambridge MA 02141
(617) 286-2392
matt@guptawessler.com

*pro hac vice* motion forthcoming

**EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP**

           /s/
Ilann M. Maazel
David Berman
600 Fifth Avenue, 10th Floor
New York, New York
212-763-5000
imaazel@ecbawm.com
dberman@ecbawm.com

*Attorneys for Plaintiffs and the
Putative Class*

26